In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2993

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT SIMPSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 260—**Ronald A. Guzman**, *Judge.*

ARGUED JUNE 5, 2006—DECIDED MARCH 13, 2007

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* After his first trial ended in a hung jury, the government retried Robert Simpson for a single delivery of crack cocaine. Although on trial only for a single sale, the jury heard evidence concerning Simpson's involvement in prior unrelated crack cocaine transactions. The prosecution repeated this evidence during its closing argument and also said Simpson had told a law enforcement agent he was a crack dealer and could have done the delivery at issue, but that he did not remember whether he had. Over defense counsel's objection, the prosecution then told the jury that the inference to be drawn from these statements was that Simpson had done so many crack cocaine deals that he could not

remember the deal for which he was on trial. This argument, and the evidence on which it was based, improperly appealed to Simpson's propensity to deal in crack cocaine. Because we are not assured that Simpson received a fair trial, we vacate Simpson's conviction and remand his case for a new trial.

## I. BACKGROUND

A federal grand jury returned a single-count indictment against Robert Simpson. This indictment charged Simpson with distributing over 50 grams of a mixture containing cocaine base on March 6, 2003, in Joliet, Illinois. Before his first trial, Simpson filed a motion *in limine* to bar evidence of his other bad acts, arguing that such evidence is not admissible to prove a defendant's propensity to commit a crime. As the government represented that it had no intention of eliciting testimony regarding Simpson's prior bad acts, the district court did not enter a ruling on the motion. The first trial ended in a mistrial after the jury was unable to reach a verdict.

The case was subsequently retried before a second jury. During the second trial, the government introduced evidence that on March 6, 2003, law enforcement officials met with confidential informant Emmanuel Bradley and directed him to buy 2 and 1/4 ounces of crack cocaine that day. Around 3:20 that afternoon, a white minivan, later determined to be registered to Simpson's wife, pulled into a small parking area behind 402 North Center Street in Joliet, Illinois where Simpson's sister lived. FBI Agent Mike Brown testified that he saw the minivan driver get into Bradley's car. However, Agent Brown could not identify the minivan driver as Simpson. Agent Brown subsequently recovered from Bradley a digital tape recorder, a plastic bag containing 61.5 grams of cocaine base, and $100 of the $1600 in buy money provided to

Bradley. Agent Brown also testified that he saw Bradley make a number of telephone calls that day, including one to a telephone number belonging to Simpson; he also saw Bradley receive a phone call from that same number a short time later.

Although Bradley had testified at the first trial and identified Simpson as the person from whom he bought crack cocaine on March 6, Bradley did not testify during the second trial. Agent Brown also did not identify Simpson as the minivan driver. Instead, the government presented Deputy Jim Stadt of the Will County Sheriff's Office as the only eyewitness to identify Simpson. Deputy Stadt testified that while using binoculars from about 75-100 yards away, he saw a person arrive in a minivan, enter Bradley's car for a minute or two, and then leave the car. While conducting this surveillance, Deputy Stadt did not know the name of the person he saw leave the minivan. After he returned to his office, he viewed a photograph of a person identified to him as Robert Simpson and concluded that Simpson was the person he had observed leaving the minivan.

Law enforcement officials waited over a year before arresting Simpson. FBI Agent Christopher Hendon effected the arrest and told the jury that on March 9, 2004, he went to Simpson's sister's home looking for Simpson. Simpson was not present, and Agent Hendon left his business card with contact information. About forty-five minutes later, Simpson called, and, after Agent Hendon informed Simpson there was a warrant for his arrest, Simpson agreed to meet him. Simpson was placed under arrest and received *Miranda* warnings. Agent Hendon testified that during the subsequent interview, after Simpson had been informed of the charge against him, "Simpson told us . . . although he didn't specifically, according to what he told us, remember delivering this 2 1/4 ounce of crack cocaine amount, that it was possible

because he had done similar type[s] of transactions and delivered for an individual that he primarily dealt with by the name of Michael Hatton."

Agent Hendon also testified that Simpson told him he had been a crack cocaine dealer for three to four years and purchased half an ounce of crack cocaine from Hatton approximately every two or three weeks. He would then break it up into smaller quantities to sell. When asked what Simpson said about 2 and 1/4 ounce quantities of crack cocaine, Hendon testified that Simpson "stated he had made similar types of deliveries on behalf of Mr. Hatton in exchange for being paid in crack cocaine but that he did not specifically remember this transaction he was being asked about during the interview." Agent Hendon did not ask Simpson to read or verify the notes he took of their conversation, stating that the FBI did not take written statements from suspects if an agent believed the subject had been less than candid.

About two days later, Agent Hendon was asked to listen to a tape recording of the March 6, 2003 controlled purchase made using the digital recorder worn by Bradley. Agent Hendon concluded that the voice on the recording "seemed" to be that of Simpson. He acknowledged at trial that he was not an expert in voice identification, and the prosecution did not tender him as such. The jury heard the tape recording and received a transcript of the recording. No physical evidence tying Simpson to the transaction was introduced.

After the jurors had heard all the evidence, the prosecution argued to the jury in its closing argument, "And you know what the defendant told him: Yes, I'm a crack dealer. I've been a crack dealer for three to four years, and I could have done this transaction, 2 1/4 ounces, on behalf of Michael Hatton, but I don't remember, because my view of the inference, the inference being - -". At this point,

defense counsel objected. The objection was overruled, and the prosecutor continued: "The inference being he's done so many that he couldn't remember this one."

The jurors submitted to the judge several questions about the evidence presented. In particular, the jurors asked why Bradley (the confidential informant) had not testified, whether any fingerprints had been lifted from the bag of cocaine, whether any voice recognition techniques had been conducted on the tape recording, and whether transcripts of Deputy Stadt's testimony and an FBI report were available to them. At the close of their deliberations, the jurors returned a guilty verdict on the sole count in the indictment. Simpson received a sentence of 188 months' imprisonment and five years' supervised release, and he now appeals.

## II. ANALYSIS

Simpson was tried only for making a single delivery of cocaine base on March 6, 2003. He was not charged with participation in a conspiracy to distribute illegal drugs. And he was not charged with distribution of cocaine base on any occasion other than March 6, 2003. With that backdrop in mind, we turn to Simpson's argument that the admission of evidence that Simpson had engaged in prior unrelated crack cocaine deals, as well as the inference the prosecutor drew in his closing argument, improperly suggested to the jury that Simpson had a propensity to act as a drug dealer and thereby denied him a fair trial.

It should be clear by now that evidence that a defendant had engaged in other drug transactions is not always admissible in a subsequent drug prosecution. *See, e.g., United States v. James*, 464 F.3d 699, 711 (7th Cir. 2006); *United States v. Wright*, 901 F.2d 68, 70 (7th Cir. 1990); *United States v. Beasley*, 809 F.2d 1273, 1278 (7th Cir.

1987). Introducing only prior drug convictions or bad acts, with nothing more, proves nothing but propensity. *United States v. Jones*, 389 F.3d 753, 757 (7th Cir. 2004), *vacated*, 545 U.S. 1125 (2005) (remanding for further consideration in light of *United States v. Booker*, 543 U.S. 220 (2005)); *see James*, 464 F.3d at 711. As one of our colleagues observed recently, "Allowing a prosecutor routinely to introduce drug convictions in the case in chief without demonstrating relevance to some concrete dispute between the litigants creates needless risk that a conviction will rest on the forbidden propensity inference." *United States v. Jones*, 455 F.3d 800, 812 (7th Cir. 2006) (Easterbrook, J., concurring). In that risk lies Simpson's concern, and ours.

## A. Admission of Evidence Concerning Prior Unrelated Drug Sales

Simpson argues on appeal that Agent Hendon's testimony concerning Simpson's involvement in unrelated drug deals was admitted in violation of Federal Rule of Evidence 404(b). Evidence that he had sold crack cocaine in the past, Simpson argues, could show only his propensity to sell crack cocaine, not that he was the person responsible for selling crack cocaine to a confidential informant on March 6, 2003. The government, however, contends that this evidence was admissible either under the "identity" exception to Rule 404(b) or pursuant to the "intricately related evidence" doctrine.

### 1. Standard of Review

When a defendant fails to object to the admission of evidence during trial, as here, our review of a challenge to the evidence's admission is for plain error. *United States v. Olano*, 507 U.S. 725, 731-35 (1993); *James*, 464 F.3d at

709; *cf. United States v. Chavis*, 429 F.3d 662, 667 (7th Cir. 2005) (reviewing decision to admit evidence for abuse of discretion where timely objection made). Our review for plain error asks whether (1) error occurred; (2) the error was "plain"; (3) and the error affected the defendant's substantial rights. *James*, 464 F.3d at 709; *see also United States v. Meadows*, 91 F.3d 851, 855 (7th Cir. 1996) (defining "error" as a "deviation from a legal rule" and an error that is "plain" as one that is "clear or obvious") (citations omitted). If these three conditions have been met, we may exercise our discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *James*, 464 F.3d at 709.

### 2. Admission of Evidence of Prior Unrelated Drug Sales Constitutes Error That Was Plain

Federal Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

The first sentence in Rule 404(b) plainly prohibits the government from introducing evidence of prior bad acts to show that the defendant's character is consistent with a propensity to commit the charged crime. *United States v. Holt*, 460 F.3d 934, 937 (7th Cir. 2006); *United States v. Macedo*, 406 F.3d 778, 792-93 (7th Cir. 2005). As then-Judge Breyer put it, "Although . . . 'propensity evidence' is relevant, the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves

punishment—creates a prejudicial effect that outweighs ordinary relevance." *United States v. Moccia,* 681 F.2d 61, 63 (1st Cir. 1982); *see also Michelson v. United States*, 335 U.S. 469, 475-76 (1948); *United States v. Seals*, 419 F.3d 600, 610-11 (7th Cir. 2005) (Posner, J., concurring).

### a.   Identity Exception to Rule 404(b)

The government maintains that the evidence of Simpson's prior unrelated drug sales is admissible to show "identity" under Rule 404(b). Rule 404(b) is first a rule of prohibition: "[e]vidence of other crimes, wrongs, or acts is *not admissible* to prove the character of a person in order to show action in conformity therewith" (emphasis added), subject only to limited exceptions. The presumption set forth in the Rule is against admissibility. And, we emphasize, simply because the evidence in question tends to show intent, motive, identity, or the like does not mean the evidence is automatically admissible. Rather, the second sentence of the rule makes explicitly clear that such evidence "may" be admissible, not that admission is automatic. *See Jones*, 455 F.3d at 810 (Easterbrook, J., concurring).

With these principles in hand, we turn to the four-part test this circuit has adopted for determining whether evidence should be admitted under Rule 404(b). We have said that evidence of a defendant's prior bad acts is admissible only if four requirements are met:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the

similar act; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice.

*Jones*, 455 F.3d at 806; *United States v. Owens*, 424 F.3d 649, 653 (7th Cir. 2005). Simpson maintains that in this case, neither the first nor the fourth requirement has been satisfied.

First, and most importantly, we must determine whether the statements in question are directed toward establishing a matter other than Simpson's propensity to sell crack cocaine. Although Simpson maintains the testimony showed only his propensity to sell drugs, the government argues the statements were directed toward establishing Simpson's identity as the person responsible for the March 6, 2003 drug delivery.

One way we have allowed admission of a defendant's prior bad acts is to prove identity through evidence of a defendant's distinctive manner of operation, or *modus operandi*. *See, e.g., United States v. Anifowoshe*, 307 F.3d 643, 647 (7th Cir. 2002); *United States v. Rollins*, 301 F.3d 511, 519 (7th Cir. 2002). We only allow evidence to be admitted under the *modus operandi* theory when the evidence bears "a singular strong resemblance to the pattern of the offense charged" with the similarities between the two crimes "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." *United States v. Thomas*, 321 F.3d 627, 634-35 (7th Cir. 2003). The reason we allow the use of other acts to show *modus operandi* is that the same person probably committed both the other acts and the charged crime due to their sufficiently idiosyncratic similarities. *See United States v. Robinson*, 161 F.3d 463, 468 (7th Cir. 1998). This reasoning does not require an inference concerning the defendant's character. But we have cautioned that "[i]f defined broadly enough, *modus operandi* evidence can

easily become nothing more than the character evidence that Rule 404(b) prohibits." *United States v. Smith*, 103 F.3d 600, 603 (7th Cir. 1996); *see also Thomas*, 321 F.3d at 635 ("If a pattern so generic can establish *modus operandi*, this fairly limited exception to Rule 404(b) would gut the Rule, rendering it useless as a check on character evidence that would otherwise be inadmissible.").

The same caution holds true for identity evidence that is not evidence of a defendant's *modus operandi*. "Certainly, the need to prove identity should not be, in itself, a ticket to admission." 1 McCormick on Evidence § 190 (6th ed. 2006). Simply because the identity of the person who sold crack cocaine to Emmanuel Bradley on March 6, 2003 was disputed does not give the government free reign to introduce evidence about any prior crack cocaine deal in which Simpson took part. Yet that seems to be the government's argument. It maintains that because Simpson denied that he was the person who delivered the drugs in question, it could introduce evidence that he had sold crack cocaine in the past, in transactions unrelated to the one at issue—evidence that we would otherwise deem improper propensity evidence—simply because it needed to prove that Simpson sold the drugs on March 6, 2003.

Our decision in *United States v. Wright*, 901 F.2d 68 (7th Cir. 1990), is instructive. There, the government contended that a wiretapped telephone call containing the defendant's admission that he participated in other drug deals had been properly admitted to show that the defendant committed the drug sale in question. 901 F.2d at 68-69. In particular, the government maintained that Rule 404(b) did not prohibit the introduction of the evidence, as it contended the evidence was admissible to show identity. *Id.* at 69. Soundly rejecting this argument, we wrote that the telephone conversation in question in *Wright* "may well show that [the defendant] is more likely to be guilty of the

crime with which he is charged than the average man on the street, who is not a drug dealer, but it does not in the least show that the man who had sold the plainclothes officers four bags of crack [in the transaction at issue] was correctly identified" as the defendant. *Id.* Those words hold true here. That Simpson allegedly admitted to prior crack cocaine deals may well show that he was more likely than an average person who had never before dealt in drugs to have sold the drugs in question. But it does not show that the identity of the person who sold drugs to Emmanuel Bradley on March 6, 2003 was Robert Simpson.

We recognized in *Wright* that evidence of prior drug crimes might tend to show the identity of the defendant if, for example, "the conversation had indicated that [the defendant] was at that time selling drugs on streets near where the transactions occurred, or if he had said something that only a party to those transactions would know." 901 F.2d at 69. Neither scenario exists here. Simpson's acknowledgment that he sold crack cocaine during the same general time period (he admitted he had sold drugs for several years prior to his arrest), and in similar quantities, is nowhere near the similarity we contemplated in *Wright*. The unfortunate reality is that Simpson was far from the only person selling crack cocaine during March of 2003 in the greater Joliet, Illinois area, and Simpson's acknowledgment that he was one of those persons does not help clear up the identity of the person responsible for the charged crime. Similarly, that Simpson named Hatton as his supplier does not tend to show that Simpson was guilty of this crime. Although there was testimony that Hatton was one of many persons who were part of law enforcement's "large scale" investigation into drug activity in the area, the government has never contended that Hatton was involved in the March 6 transaction, that Hatton had any relationship with Bradley, or that Hatton had supplied the drugs at issue.

*Cf. United States v. Joseph*, 310 F.3d 975, 978 (7th Cir. 2002) (defendant's prior mail theft helped to establish identity in instant case because it linked defendant with one of the aliases used by the perpetrator). This evidence, then, did not help establish a matter in issue other than his propensity to sell crack cocaine.[1]

Furthermore, the admission of the evidence carried a significant danger of unfair prejudice. Evidence is unfairly prejudicial if it will cause the jury to decide the case on "improper grounds." *Chavis*, 429 F.3d at 668. Here, the jurors were invited to conclude that Simpson's prior drug deals proved his guilt for the transaction charged in the indictment. Significantly, too, the government's evidence did not stop at Simpson's statement that it was "possible"

---

[1] In *United States v. Gibson*, 170 F.3d 673 (7th Cir. 1999), to which the government points, the defendant pursued the specific defense that his brother had sold the drugs in question. *Id.* at 679. There, the defendant's history of drug dealing distinguished him from the only other person he contended had committed the crime. Here, in contrast, Simpson put forth no defense except to deny that he was responsible for the charged crime and to maintain the government had not proven its case beyond a reasonable doubt. *Wright*, not *Gibson*, governs this case. And as in *Wright*, evidence of Simpson's prior drug activity was not admissible to show identity, unless "[b]y 'identity' the [government] must have meant 'guilt,'" 901 F.2d at 69, which, of course, is not proper. We explained in *Wright* that the "logic of the district court's ruling [to allow evidence of the defendant's unrelated drug deals] is that a drug defendant's prior drug convictions are admissible per se, even if they do not help to clear up a question of identification or establish a modus operandi or otherwise illuminate the particular conduct of which the defendant is accused, and even if he does not take the stand . . . ." *Id.* at 70. But "[t]his use of other crimes to establish a propensity to commit the type of crime charged is the use of such evidence that Rule 404(b) forbids." *Id.*

he had delivered the crack cocaine at issue. Instead, additional details regarding Simpson's prior crack cocaine deals were revealed. Agent Hendon testified that Simpson thought his involvement was possible "because he had done similar type[s] of transactions" and he had "delivered for an individual that he primarily dealt with by the name of Michael Hatton." Agent Hendon then continued to provide details about Simpson's drug-dealing past: he told the jurors that Simpson said he had been a dealer of crack cocaine, that he had been a dealer for three to four years, and that he purchased a half ounce of crack cocaine from his supplier about every two or three weeks, which he would then break up and sell.

In addition, the jurors did not receive a relevant limiting instruction, which can minimize prejudice from the introduction of Rule 404(b) evidence. *See Jones*, 455 F.3d at 809; *Chavis*, 429 F.3d at 668-69; *United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir. 1994) (upholding evidence's admission for purposes of knowledge, intent, and motive where the "district court carefully explained to the jury that Kreiser was not on trial for anything that happened in 1984, but only for the events of 1991"); *see also Jones*, 455 F.3d at 811 (Easterbrook, J., concurring). The jury did receive the following instruction: "If you find that the defendant did make the statement, then you must decide what weight, if any, you feel the statement deserves. In making this decision, you should consider all matters in evidence having to do with the statement . . . ." This instruction drew attention to Simpson's purported statements to Agent Hendon, but the jurors did not receive any instruction limiting how they could or should use the statements. We conclude that the identity exception to Rule 404(b) does not support the admission of evidence pertaining to Simpson's prior unrelated drug sales.

### b.  "Intricately Related Evidence" Doctrine

Nor is this evidence admissible under the "intricately related evidence" doctrine, the only other theory the government suggests to supports its admission. By its terms, Rule 404(b) only applies to "other" crimes and conduct; it does not apply to acts that provide proof of the charged conduct. *See United States v. Lane*, 323 F.3d 568, 579 (7th Cir. 2003). As a result, "[e]vidence of uncharged criminal activity does not implicate the character/propensity prohibition of Rule 404(b) if the evidence is 'intricately related' to the facts and circumstances of the charged offense." *United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006). Admission is, of course, still contingent on successfully passing the balancing test set forth in Federal Rule of Evidence 403. *James*, 464 F.3d at 709; *Holt*, 460 F.3d at 937-38.

The government argues that Agent Hendon's testimony was admissible as evidence that was intricately related (or "inextricably intertwined") with that of the charge that Simpson delivered crack cocaine on March 6, 2003. According to the government, the details Simpson provided about his involvement in uncharged drug deals were admissible because they arose out of "the same transaction or series of transactions as the charged offense." *See United States v. Lott*, 442 F.3d 981, 985 (7th Cir. 2006).

We have upheld the admission of evidence under the intricately related evidence doctrine when the evidence was necessary to complete the story of a crime on trial. *McLee*, 436 F.3d at 760; *United States v. Gibson*, 170 F.3d 673, 682 (7th Cir. 1999); *cf.* 1 McCormick on Evidence § 190 (6th ed. 2006) (cautioning that "[t]his rationale should be applied only when reference to the other crimes is essential to a coherent and intelligible description of the offense at bar"). We have also done so when the

evidence was needed to avoid a conceptual or chronological void in the narrative of the crime on trial. *United States v. Andreas*, 216 F.3d 645, 665 (7th Cir. 2000); *United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir. 1984). And we have found evidence admissible under the intricately related evidence doctrine when it is so blended or connected that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of the charged crime. *United States v. Heath*, 447 F.3d 535, 539 (7th Cir. 2006); *United States v. Spaeni*, 60 F.3d 313, 316 (7th Cir. 1995).

These rationales do not apply here. Simpson was not charged with conspiracy to distribute crack cocaine. He was not charged with responsibility for a series of drug transactions. He was not charged with selling drugs on Hatton's behalf. Instead, he was on trial for only one delivery, on one day, to one person. Evidence of any prior unrelated drug sales was simply not necessary to complete the story of the single delivery on trial. Nor was it needed to avoid a conceptual or chronological void in the story of the March 6, 2003 delivery. And it was not necessary to explain the circumstances of the single crack cocaine delivery on March 6, 2003.

The case to which the government pointed us when we asked for an analogous case, *United States v. Lott*, 442 F.3d 981, is inapposite. First, *Lott* did not involve admission of unrelated, uncharged drug activity in a case where only a single drug delivery was at issue. *Cf. James*, 464 F.3d at 710 (finding evidence of drugs seized one month after drug offense for which defendant was indicted not intricately related to charged conduct). In *Lott*, officers recovered from a vehicle driven by the defendant a loaded pistol on top of a bag containing a white powder that turned out to be a crushed prescription drug. 442 F.3d at 985. The defendant was charged with being a felon in

possession of a firearm, and we upheld the admission of evidence that he possessed the bag of white powder and that he had previously dealt in "dummy drugs" under the intricately related evidence doctrine. *Id.* We did so because the evidence explained the motive for the defendant's possession of a firearm, the crime with which he was charged—to defend himself from angry customers. *Id.*

Unlike the admitted evidence in *Lott*, which helped complete the story of the crime *on trial* in that case, evidence relating to Simpson's prior drug involvement would not help a jury form a more complete picture of the March 6 drug deal for which he was on trial. Evidence that Simpson had sold drugs over the last three or four years does not explain why he, as compared to any other person who had also sold drugs at that time, was responsible for the drug sale for which he was on trial.

The government argues otherwise, contending that "details" Simpson gave after stating it was "possible" he had sold the drugs in question corroborated his "confession" that it was possible he had sold the drugs on March 6. First, there was no confession. Certainly, if Simpson had told Agent Hendon he sold crack cocaine to Bradley on March 6, 2003 under circumstances matching the government witnesses' testimony, the government could have argued to the jury that Simpson had admitted to the crime for which he was charged. But Simpson did not do that. His statement that it was "possible" he was responsible for the charged transaction, but that he did not remember, does not constitute a confession of responsibility for the March 6, 2003 drug deal. "A confession is a suspect's oral . . . acknowledgment of guilt often including details about the crime." *United States v. Gilbertson*, 435 F.3d 790, 798 (7th Cir. 2006) (quoting Black's Law Dictionary 317 (8th ed. 2004)); *see Opper v. United States*, 348 U.S. 84, 91 n.7 (1954). Here, at best, Simpson stated he did not remember the transaction. At no time did he

acknowledge he was guilty of selling illegal drugs to Bradley on the date in question. He provided no details whatsoever about the March 6, 2003 drug deal, as he could not even remember if he was there. Admitting that he had engaged in similar drug deals in the past, making "possible" his responsibility for the drug deal at issue, falls far short of an acknowledgment of responsibility for the charged deal.

Next, the "details" to which the government points—that he had sold crack cocaine before, for a number of years, at times in the same quantity—were only details about prior uncharged drug deals and did not shed any light on the question of the person responsible for the March 6 sale. These "details" about prior unrelated drug deals on unknown dates with unknown persons did not arise out of the same transaction or series of transactions as the March 6 transaction for which he was on trial. Evidence of prior unrelated drug deals is not "intricately related" to the transaction on trial simply because knowledge of the other deals was gained in the same interview.

The testimony about Simpson's prior acts did nothing more than cloak him before the jury in his prior crack cocaine deals. In short, had the jurors heard nothing about Simpson's prior drug sales, "it would not have occurred to them that they were missing anything or have made any of the other evidence in the case unintelligible." *See United States v. Paladino*, 401 F.3d 471, 475 (7th Cir. 2005). Admission of the evidence of Simpson's prior drug sales cannot be justified under the intricately related evidence doctrine, and the evidence's admission constitutes error that was plain.[2]

---

[2] The dissent maintains that the agent's testimony concerning details Simpson gave about his involvement in past drug deals constituted admissions against Simpson's interest. Such state-

(continued...)

### 3. Whether the Erroneous Admission of Evidence Warrants a New Trial

Testimony concerning Simpson's past drug sales thus cannot be justified under either the identity exception to Rule 404(b) or under the intricately related evidence doctrine. To succeed on a plain error challenge, a defendant must also demonstrate that the error in admission affected his substantial rights, meaning that the error "affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. If so, we may correct the error if it seriously affects the "fairness, integrity, or public reputation of judicial proceedings." *Id.* at 736.

Simpson urges that we look not simply at the erroneous admission of evidence about his past drug deals when we consider whether he should receive a new trial. Rather, he

---

[2] (...continued)

ments are not hearsay. Fed. R. Evid. 801(d)(2)(A). That a statement is not hearsay, however, does not answer the separate question of whether the statement is precluded as improper propensity evidence, the question at issue in this case. *See United States v. Oberle*, 136 F.3d 1414, 1418 (10th Cir. 1998) ("Although the statements are party admissions under Rule 801(d) and thus not hearsay, they must nevertheless also be analyzed for admissibility under Rule 404(b) because they reveal or suggest prior criminal conduct."); *United States v. Mickle*, 859 F.2d 473, 478-79 (7th Cir. 1988) (recognizing that testimony recounting defendant's statement qualified as party admission and was not hearsay, but stating that "does not end our inquiry" before analyzing whether statement was admissible under Rule 404(b)); *see also United States v. Godinez*, 110 F.3d 448, 454-55 (7th Cir. 1997) (analyzing first whether statement constituted inadmissible hearsay, then whether Rule 404(b) precluded its admission). The government offered us two theories in support of the admissibility of this evidence, the intricately related evidence doctrine and proof of identity under Rule 404(b), and we conclude that neither justifies its admission.

contends that the inference the prosecutor drew in his closing argument from the evidence regarding Simpson's prior crack cocaine sales, along with the erroneous admission of this evidence, deprived him of a fair trial.

## B.   The Prosecution's Closing Argument

In this case, the reason the government had introduced testimony of Simpson's numerous prior crack cocaine transactions became clear during the prosecution's closing argument. Throughout the first and second trials, until its closing argument in the second trial, the government suggested that Simpson's statements to Agent Hendon constituted a confession. During the prosecution's closing argument, it sought to use Simpson's statements to show propensity, explicitly stating: "The inference being he's done so many that he couldn't remember this one."

Simpson argues that the inference the prosecutor explicitly drew for the jury during closing argument, one that asked the jury to decide Simpson's fate based on an inference that he had done "so many" drug deals that he could not remember the one for which he stood trial, constituted prosecutorial misconduct. The government argues that our standard of review on appeal on this claim should be for plain error, the standard appropriate when a criminal defendant challenges statements in the prosecution's closing argument for the first time on appeal. *See United States v. Bowman*, 353 F.3d 546, 550 (7th Cir. 2003). But Simpson's counsel objected to the portion of the closing argument he now challenges, and he did so immediately after the prosecutor uttered the words, "the inference being - -" in his closing argument. Because Simpson's counsel objected at the time the remarks were made, our review of the district court's decision to overrule the objection is for an abuse of discretion. *See*

*United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003).

We have evaluated claims that a prosecutor's closing argument constituted an improper appeal to a defendant's propensity to engage in certain conduct under the framework of "prosecutorial misconduct." *See Bowman*, 353 F.3d at 550. When evaluating claims that a prosecutor's comments to a jury rise to the level of prosecutorial misconduct, we first determine whether the prosecutor's conduct was improper. *United States v. Hale*, 448 F.3d 971, 986 (7th Cir. 2006); *see also United States v. Wesley,* 422 F.3d 509, 515 (7th Cir. 2005). If so, we next assess whether the conduct prejudiced the defendant. *Hale*, 448 F.3d at 986; *United States v. Washington*, 417 F.3d 780, 786 (7th Cir. 2005).

### 1. Impropriety of the Closing Argument

Just as introducing evidence to show propensity is improper, so too is arguing to a jury that it should convict a defendant based on the defendant's propensity to commit a crime. *See Bowman*, 353 F.3d at 551. Simpson maintains that the prosecutor's inference that Simpson had done so many drug transactions in the past that he could not remember the one for which he stood trial amounts to nothing more than a prohibited "once a drug dealer, always a drug dealer" argument. We agree.

This argument said nothing about which person arrived in the minivan on March 6, 2003. It said nothing about which person entered the car with Emmanuel Bradley on that day. And it said nothing about which person sold the crack cocaine to Bradley. The prosecution's closing argument simply, and improperly, asked the jury to conclude that his admission to prior drug deals demonstrated his guilt for the March 6, 2003 transaction. *Cf.*

*Bowman*, 353 F.3d at 551 (finding no prosecutorial misconduct where prosecutor used facts adduced at trial "for permissible purposes" and did not "ask[ ] the jury to draw the inference that because Bowman had admitted problems abiding by the law, he must be guilty of the crime in question"). Because the inference made by the prosecutor instructed the jurors to convict Simpson based on his prior uncharged drug deals, the inference was improper.[3]

### 2. Prejudice

We turn next to the question of prejudice. Our assessment of whether a prosecutor's improper conduct prejudiced a defendant includes an examination of six factors: (1) whether the prosecutor misstated the evidence; (2) whether the remarks implicated the specific rights of the accused; (3) whether the defense invited the response; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut. *Hale*, 448 F.3d at 986; *Washington*, 417 F.3d at 786. Simpson does not contend that the comments implicated a specific right, such as the Fifth Amendment right against self-incrimination. *Cf. United States v. Mietus*, 237 F.3d 866, 870 (7th Cir. 2001). Therefore, we "consider the remarks in light of the entire record to determine if the defendant was deprived of a fair trial." *United States v. Wesley*, 422 F.3d at 515.

Our examination of the record as a whole leads us to conclude that the prejudicial impact of the prosecution's closing argument, which the dissent does not even men-

---

[3] In finding this way, although our precedent labels this claim "prosecutorial misconduct," we do not mean to suggest that the prosecutor's remarks in this case were made with the intent to suggest an improper propensity inference to the jury.

tion, was significant. In a case where the circumstantial evidence against Simpson was close, the prosecution's explicit instruction to the jury to draw the inference that Simpson had conducted "so many" crack cocaine deals that he could not remember the deal for which he stood trial was a powerful argument. Telling a jury to conclude that a defendant cannot remember the drug sale for which he is on trial because he had done "so many" in the past is no insignificant matter.

Moreover, the jurors did not receive an instruction limiting the conclusion that they could permissibly make from the prosecutor's improper comments, an instruction that might have limited the impact of the statement. Nor did Simpson invite the prosecutor's propensity inference. And, although Simpson's counsel's closing argument followed the prosecution's improper comments, Simpson could not introduce any evidence of good character at that point, and the damage from the prosecutor's inference was already done.

Next, although the government argues that the prosecution's closing arguments did not misstate admitted evidence, it invited the jury to make an improper inference from the evidence, an action with a similar effect. As we made clear, neither the identity exception to Rule 404(b) nor the intricately related evidence doctrine support the admission of Agent Hendon's testimony concerning Simpson's prior drug deals, and the introduction of this evidence was erroneous.

And with Simpson's statements about his prior drug deals omitted, the circumstantial evidence presented by the government was far from overwhelming. Notably, confidential informant Bradley did not testify at the second trial. Even though the jurors at the first trial had the benefit of Bradley's testimony that he had purchased crack cocaine from Simpson on March 6, 2003, that jury

did not convict Simpson. In addition, the jurors' questions during the second trial illustrate that like the jurors in the first trial, they too had doubts about Simpson's guilt. The jurors asked whether any fingerprints had been lifted from the bag of cocaine, whether any voice recognition techniques had been conducted on the tape recording, and why Bradley had not testified, all questions relating to the amount of evidence that linked Simpson to the charged crime in a case where no physical evidence had been introduced connecting him to the deal. They also asked to see transcripts of Deputy Stadt's testimony and an FBI report, but neither was produced.

Although the circumstantial evidence in this case would be enough to uphold a jury's guilty verdict under a challenge to the sufficiency of the evidence supporting such a verdict, it is not enough to say that the outcome probably would have been the same without the prosecutor's improper propensity inference and the evidence of Simpson's past unrelated drug deals. In the second trial at issue here, where the jurors did not have the benefit of the confidential informant's testimony, the introduction of evidence that Simpson had been a crack cocaine dealer for several years created the risk that Simpson's conviction would be the result of the "forbidden propensity inference." *See Jones*, 455 F.3d at 812 (Easterbrook, J., concurring). And when the prosecutor explicitly told the jurors to draw the inference that Simpson had done so many drug deals in the past that he could not remember doing this one, the risk that the jury would convict Simpson based on his history as a crack cocaine dealer was only compounded. Thus, we are not assured that Simpson received a fair trial, and we remand his case for a new trial.

### III. CONCLUSION

The judgment of the district court is VACATED, and this matter is remanded to the district court with instructions to grant a new trial.

BAUER, *Circuit Judge*, dissenting. I respectfully dissent.

Stripped of all unnecessary verbiage, the majority takes the position that it was plain error (because its admission was not objected to at trial—in fact, not at either trial) for the agent of the FBI to relate the statement of the defendant, delivered voluntarily after he received the Miranda warning. As the majority agree, the statement was based on an exchange between the defendant and the agent essentially as follows: The defendant asked what the charge against him was. The agent told him. The agent then testified that: The defendant "told us . . . although he didn't remember delivering this 2-1/4 ounce of crack . . . it was possible because he had done similar types of transactions" around the time and place of the charged crime. And, said the defendant, he had been a crack cocaine dealer for three or four years.

Quibbling over this statement, obviously against interest, penal and otherwise, as to whether it was a full confession or not misses the point; the admission of the statement was not only not plain error, it was admissible even in the face of an objection. The defense trial tactic was to deny that the statement was made, not that it wasn't admissible evidence.

In the beginning of the trial, the government agreed that evidence of prior crimes—meaning, of course, the convictions for armed robbery and aggravated battery with a firearm—would not be referenced by the government unless the defendant testified. The defendant's voluntary statement, which virtually amounted to a confession in the true sense of the word, was not in contention. It was discussed without objection in the opening statement, referred to by the defense attorney acknowledging the proposed testimony but pooh-poohing its existence in his opening statements and was considered, together with the other evidence such as the tape recording of the defendant negotiating a sale with a confidential witness, and other evidence, by the jury. The defendant's statement that he "might have committed the crime" was certainly relevant and his reason for the memory fog was explained by the fact that the transaction was just one of many similar transactions, all distributing crack, and saying that, a year later, an exact recollection of every sale was more that he could muster.

I know of no reason why the defendant's statement was inadmissible, nor do I know how it could have been used without using it entirely. The defendant not only did not deny the crime, he acknowledged the possibility was undeniable; he was in the business, in the area, and in the time span. To rule the statement inadmissible is to defy logic.

I would affirm.

A true Copy:

     Teste:

                   _____

                   *Clerk of the United States Court of*
                   *Appeals for the Seventh Circuit*