In the

# United States Court of Appeals
### For the Seventh Circuit

———————

No. 07-1613

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ROBERT A. HEARN,

*Defendant-Appellant*.

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 CR 30040—**Jeanne E. Scott,** *Judge*.

———————

ARGUED FEBRUARY 21, 2008—DECIDED JULY 18, 2008

———————

Before FLAUM, RIPPLE and ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. On May 5, 2006, Robert Hearn was charged with one count of possession with intent to distribute five grams or more of cocaine base (crack), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). A jury found him guilty, and he was sentenced as a career offender to 360 months' imprisonment. For the reasons set forth in this opinion, we affirm his conviction but remand for resentencing in light of *Kimbrough v. United States*, 128 S. Ct. 558 (2007).

# I

# BACKGROUND

## A.

On the night of March 24, 2006, two City of Spring-field, Illinois police officers, Jason Sloman and Kevin Scarlette, observed two men walking from a back alley. Officer Sloman recognized one of the men as Michael Collins, a suspect in a forgery case. He called after Collins, who walked away quickly and attempted to enter a residence. The officers pursued Collins and apprehended him at the back door of the residence.

The man with Collins was the defendant, Robert Hearn. As Collins was attempting to flee, Mr. Hearn stood in the driveway of the residence with his hands in his pockets. Officer Sloman detained Collins, and Officer Scarlette asked Mr. Hearn to take his hands out of his pockets. As he did so, Officer Scarlette saw Mr. Hearn toss an object onto the pavement. He therefore detained Mr. Hearn until a third officer, Jonathan Wingerter, arrived and retrieved the object. It was a plastic bag that contained what appeared to be a large chunk of crack cocaine and some separately packaged powder. When Officer Wingerter seized the bag, Mr. Hearn exclaimed: "That ain't my dope. You can't pin it on me." Tr. at 199, 402.

The officers arrested both Collins and Mr. Hearn and took them separately to the police station for booking. No contraband was found on Mr. Hearn; however, Collins was caught attempting to dispose of a crack pipe in a garbage can. The bag found on the pavement was submitted for forensics testing. A chemist at the police forensic laboratory analyzed its contents and determined

that it contained 11 grams of crack cocaine and 15.4 grams of powder cocaine.

On May 5, 2006, a federal grand jury charged Mr. Hearn with one count of possession with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

On May 17, 2006, Mr. Hearn met with his attorney to discuss his options. The attorney informed him that, as a career offender, he would face a possible sentence of 360 months to life imprisonment if convicted at trial, 262-327 months if he pleaded guilty, and less than that if he cooperated with law enforcement authorities. Mr. Hearn decided to cooperate.

During a proffer session on May 25, 2006, Mr. Hearn told law enforcement officers that he had been dealing powder cocaine and crack cocaine regularly since 1997, and he identified two of his suppliers. Hoping that he would be released to participate in controlled buys with these informants, he gave the agents substantial information regarding his pattern of interaction with these two major dealers. The agents did not ask Mr. Hearn if he had possessed the particular drugs for which he was arrested, however, allegedly because they had presumed that he was going to plead guilty.

When his cooperation did not result in his release, Mr. Hearn attempted to procure his release another way. On June 7, 2006, he made four telephone calls from jail to enlist the help of his girlfriend and a friend, "Little G." Mr. Hearn suggested that Little G "take this thing for me," R.29, Ex. 13-T at 5, by going to a particular attorney's office and signing a statement that the drugs found near Mr. Hearn actually belonged to Little G. Mr.

Hearn told his girlfriend that Little G, unlike Mr. Hearn, would receive only probation because he had no prior criminal record. This plan ultimately was abandoned, however, when the attorney informed Little G that he would be subject to five to ten years' imprisonment if he signed the statement.

**B.**

Prior to trial, Mr. Hearn filed a motion in limine requesting that the court prohibit the Government from introducing any statements that he had made during his cooperation meeting with law enforcement officers unless, as provided by the terms of the agreement, he took a position at trial contrary to a specific statement made during the proffer session. The court granted his motion. It ruled that the Government could introduce these prior statements only if Mr. Hearn took the stand and provided testimony contrary to what he had told the agents. In that case, he would be subject to impeachment just like any other witness, and the Government would be allowed to use his prior statements regarding both the charged offense and his history of drug dealing in order to accomplish that impeachment.

Mr. Hearn also filed a pre-trial motion in which he requested permission to introduce evidence of his attorney's earlier advice to him regarding the possible sentences that he might face with and without cooperation. This evidence was intended to explain his mental state during his meeting with the Government and to suggest that he had a serious incentive to exaggerate his prior participation in the drug trade in the hopes that he would be released to participate in controlled buys. The

district court ruled that this evidence would be admissible to prove Mr. Hearn's state of mind, but the court warned that its introduction would open the door for either side to introduce evidence to explain that the attorney had warned Mr. Hearn that he would receive a lengthy sentence because he could be sentenced as a career offender.

On July 26, 2006, the Government filed a notice of its intention to introduce, under Federal Rule of Evidence 404(b), evidence of Mr. Hearn's prior conviction for distribution of crack cocaine on March 12, 2003. Mr. Hearn objected. The district court ruled that the facts underlying Mr. Hearn's 2003 conviction were probative of his knowledge, lack of mistake and intent to distribute the cocaine in this instance. It also noted that the potential for prejudice was minimal compared to the probative value of the evidence—especially considering that Mr. Hearn himself planned to introduce evidence of his attorney's warning that he was a career offender. Accordingly, the district court ruled that it would allow the Government to introduce at trial, for these limited purposes, evidence of the facts surrounding his 2003 conviction.

At trial, the Government began its opening statement with the following comment:

> This case is about a drug dealer, who I believe you will hear evidence that he has distributed crack cocaine in the past. And then again on March the 24th of 2006, he was caught with well over 5 grams of crack and almost half an ounce of powder cocaine.

Tr. at 149-50. It then informed the jury that it would hear testimony from the police officers who encountered Mr. Hearn that night, from the forensic scientists who

analyzed the recovered bag and the substance found inside, and from an expert on drug quantities and distribution amounts. The Government also told the jury that it would hear excerpts from recordings of Mr. Hearn's phone calls from jail, in which he encouraged another person to take the blame for his offense.

Defense counsel began his opening statement by explaining the elements of the crime that the Government was required to prove, particularly the element of "intent to distribute." Tr. at 154. Specifically, counsel stated: "Now five grams is not very much. The evidence will show that this is a very small amount of drugs. And that brings into play the second element. . . . intent to distribute." *Id*. He went on to question whether such a "very small amount of drugs" was possessed "for personal use or for distribution." Tr. at 155. He also reminded the jury that the Government carried the burden to prove that the substance at issue was more than five grams of crack, as opposed to another type of cocaine base, and that Mr. Hearn himself actually had possessed these drugs.

During its case in chief, the Government presented the testimony of Officers Scarlette and Sloman, who had stopped and subsequently arrested Mr. Hearn on the night in question. A fingerprint analyst then testified regarding his examination of the recovered bag; he stated that he had found no fingerprints that were suitable for analysis or comparison. The Government also introduced the tape recordings of Mr. Hearn's phone calls from jail, in which he had attempted to solicit the help of his girlfriend and Little G.

As proof that the substance in question was crack cocaine, the Government presented the testimony of the forensic analyst who had weighed and analyzed all of the

substances found in the bag. She testified that her analysis had determined that "the 11.0 grams of off-white chunky substance contained cocaine base," which is "what we commonly refer to as rock or crack cocaine." Tr. at 246. The officer who had seized the bag from the ground on the night of Mr. Hearn's arrest also testified that the bag had contained "what appeared to be a large chunk of crack cocaine." Tr. at 222-23. Finally, the Government offered expert testimony from a DEA agent who examined the substance on the stand and testified that, based on his knowledge and experience with the drug trade, it "appear[ed] to be a chunk of crack cocaine." Tr. at 370-71.

On the issue of intent, the Government proffered expert testimony that the packaging of the drugs found in this case was indicative of an intent to distribute: The crack was separately packaged in different quantities, amounts and sizes for different customer preferences, and powder cocaine also was included with the crack cocaine. Tr. at 371-72. The agent testified that a typical crack user does not carry pre-cooked powder along with his crack; instead, he simply purchases cocaine in crack form. Tr. at 372.

The remainder of the Government's case in chief involved Mr. Hearn's prior drug convictions. Two Springfield police officers testified about a raid on Mr. Hearn's residence that occurred on March 12, 2003, which ultimately resulted in Mr. Hearn pleading guilty to a charge of distribution of crack cocaine. The officers explained that Mr. Hearn's home had been targeted for a raid because of suspicious high-traffic activity in and out of the home and because a controlled buy had taken place there earlier that day. The officers testified that they

had discovered crack and marijuana on Mr. Hearn's kitchen table and more than $1,400 in cash in Mr. Hearn's pocket. The recovered money included $30 in pre-recorded, official advanced funds that had been used by a confidential informant in the controlled buy earlier that day. The Government also introduced as an exhibit the crack cocaine and marijuana that was seized in the 2003 raid. It concluded its case in chief by introducing Mr. Hearn's stipulation that he had pleaded guilty to having distributed a controlled substance on March 12, 2003.

The court instructed the jury regarding the purposes for which this evidence was admitted:

> [T]his evidence is to be considered by you only on the question of the defendant's knowledge of cocaine, his intent in this case on March 24th, 2006, and to show a lack of mistake on his part on what was in the plastic bags. He is not charged in this case with anything that occurred on the March 12th, 2003 incident. You may consider the evidence about the March 12, 2003 incident only for the limited purposes I have told you, which are with respect to his knowledge, intent, and lack of mistake in our case, which occurred allegedly on March 24th of 2006.

Tr. at 278-79; *see also* Tr. at 341-42 (a similar statement).

In addition to questioning the Government's proof on the elements of the crime, Mr. Hearn chose to present a defense. He took the witness stand and testified that he had been merely an innocent bystander on the night in question, and that he had not thrown a bag onto the ground. He explained that he nevertheless had decided to cooperate with the Government, and later attempted to convince a friend to take the blame for him, because

he thought that a black man with two prior convictions would be convicted regardless of his innocence. He testified that he therefore had felt the need to do whatever he could to procure his release or to reduce his sentence.

Mr. Hearn admitted that he had told the agents in his proffer session that he had been dealing crack and powder cocaine consistently since 1997. He maintained, however, that all of his drug dealing had ended when he went to prison in 2003. He testified that he had exaggerated the truth in his proffer session when he told the agents that he had bought and sold a significant amount of crack from two major dealers after his release from prison in the hope that they would release him again to perform controlled buys. Mr. Hearn also testified that 11 grams of crack was a typical quantity of crack for an individual to possess for personal use.

On rebuttal, the Government presented the testimony of a DEA agent who had participated in the proffer session with Mr. Hearn. He testified that Mr. Hearn had told him that he had been receiving cocaine from a particular dealer "all the way up to the time of his arrest" in this case. Tr. at 459, 461. The district court admitted without objection certified copies of Mr. Hearn's three prior drug convictions, and it instructed the jury to consider the evidence only for the purpose of deciding whether Mr. Hearn's testimony was truthful.

In closing arguments, the Government made the following statement:

> Now, when I talked to you at the beginning of this trial in opening statement, I told you that what this case was about was a drug dealer who was once again caught on March the 24th of 2006, with cocaine and

cocaine base crack cocaine. And who has since then engaged in one deceitful act after another trying to avoid the consequences of what he did. And that is exactly what you heard.

Tr. at 570.

At the conclusion of the evidence, the district court instructed the jury on, among other things, the definition of crack cocaine. Specifically, it stated that "cocaine base ('crack') is defined as a form of cocaine base, produced by mixing cocaine hydrochloride with baking soda and water, boiling the mixture until only a solid substance is left, and allowing it to dry, resulting in a rock-like substance." Tr. at 562-63. It also stated that "all crack is cocaine base but not all cocaine base is crack." Tr. at 563.

On August 17, 2006, after a three-day trial, the jury found Mr. Hearn guilty of distributing over 5 grams of crack cocaine. He moved for a judgment of acquittal on the ground that the evidence was insufficient to prove that the substance in question was crack. The district court denied the motion. On March 16, 2007, the district court sentenced Mr. Hearn to 360 months' imprisonment, 8 years of supervised release and a $100 special assessment. This timely appeal followed.

## II

## DISCUSSION

### A.

Mr. Hearn contends that the district court should not have allowed the Government to introduce evidence of the facts surrounding his 2003 conviction for drug distribution. In his view, this evidence was used largely to

show that he had a propensity to commit the crime, an inadmissible purpose under Rule 404(b). *See United States v. Simpson*, 479 F.3d 492, 497 (7th Cir. 2007). He points specifically to the Government's opening and closing statements, in which it framed the case as being about a "drug dealer" who "once again was caught" selling drugs. Tr. at 570. These statements, he contends, prove that the evidence was offered for "nothing more than a prohibited 'once a drug dealer, always a drug dealer' argument." *Simpson*, 479 F.3d at 503. We review the district court's evidentiary rulings for abuse of discretion. *United States v. Dennis*, 497 F.3d 765, 769 (7th Cir. 2007).

Rule 404(b) prohibits the use of evidence of prior crimes to prove the character of a person or his propensity to commit the charged crime; however, it allows the court to admit evidence of a defendant's prior crimes for other permissible purposes, "such as proof, motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake." Fed. R. Evid. 404(b). In determining whether evidence is admissible under Rule 404(b), we consider whether:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Jones*, 455 F.3d 800, 806-07 (7th Cir. 2006) (quoting *United States v. Toro*, 359 F.3d 879, 884 (7th Cir. 2004)).

The district court determined that evidence of Mr. Hearn's prior conviction was relevant to show that he had knowledge of cocaine and that he had not been mistaken as to what was in the bag. It also viewed the evidence as probative of his intent to distribute the crack—a fact of particular relevance, given Mr. Hearn's defense that he was an innocent bystander as well as his testimony that the quantity of drugs found in the bag was not indicative of an intent to distribute. *See United States v. Jones*, 455 F.3d 800, 808-09 (7th Cir. 2006) (explaining that evidence of prior convictions is particularly probative where a defendant admits possession but denies intent to distribute, although it also may be introduced when he flatly denies all elements of the charge); *United States v. Chavis*, 429 F.3d 662, 668 (7th Cir. 2005) (noting that the defendant opens the door to the use of the conviction by asserting a lack of intent for a specific intent crime). The court emphasized that the events resulting in his prior conviction had occurred just a few years before the incident in question and that the prior conviction was for the same crime as the charged crime. The district court also concluded that the evidence was not more prejudicial than probative here because (1) Mr. Hearn had put his intent to distribute squarely at issue, and (2) Mr. Hearn already planned to introduce the evidence of his prior convictions to show why he feared a particularly lengthy term of imprisonment. Accordingly, the court found that the specific facts of the prior conviction would be relevant regarding Mr. Hearn's intent and lack of mistake, without being especially prejudicial.

Mr. Hearn notes that the "presumption set forth in the Rule is against admissibility," and "simply because the

evidence in question tends to show intent, motive, identity, or the like does not mean the evidence is automatically admissible." *Simpson*, 479 F.3d at 497. The Government has the obligation to "affirmatively show why a particular prior conviction tends to show the more forward-looking fact of purpose, design, or volition to commit the new crime." *Chavis*, 429 F.3d at 668 (quoting *United States v. Jones*, 389 F.3d 753, 757 (7th Cir. 2004). Here, when the Government was asked why it wished to admit this evidence, it stated simply: "Intent, to show intent. To show absence of mistake. To show his knowledge. Because in this case he is arrested—he is arrested and found with—or found with crack and powder cocaine." Tr. at 13. The court, in admitting the evidence, offered a similarly sparse explanation.

Nevertheless, it is well established that this type of evidence is particularly probative when the defendant puts the question of intent squarely at issue. *See Jones*, 455 F.3d at 808-09; *Chavis*, 429 F.3d at 668.[1] Mr. Hearn's assertion that intent is not at issue in this case because he simply had denied possession of the drugs is belied by the record. In defense counsel's opening statements, he informed the jury that he would challenge the Government's proof on the intent element of the crime. He specifically questioned whether such a "very small amount of drugs" was indicative of an intent to distribute. Tr. at

---

[1] The cases cited by Mr. Hearn do not suggest otherwise; in those cases, the defendants did not open the door to this type of evidence by challenging specifically the Government's proof on the intent element of the crime. *See United States v. Simpson*, 479 F.3d 492, 496 (7th Cir. 2007); *United States v. Wright*, 901 F.2d 68, 69 (7th Cir. 1990).

155. Mr. Hearn also testified that the quantity of crack found in the bags was an amount that a heavy crack user could consume alone in a few days. Given this testimony, his prior conviction for distribution certainly was probative of his intent to distribute a similar quantity of crack. The district court therefore did not abuse its discretion when it admitted this evidence.

Mr. Hearn further submits that the sheer volume of Rule 404(b) evidence admitted by the Government was unnecessary and unduly prejudicial. He argues that the Government impermissibly "flood[ed] the courtroom" with other-crimes evidence, *United States v. Draiman*, 784 F.2d 248, 254 (7th Cir. 1986), presenting seven (of thirteen total) witnesses to testify about the facts of his prior convictions. Indeed, he asserts, the amount of testimony presented regarding his prior crimes was approximately equal to the amount of testimony regarding the crime at issue. Given that he already had stipulated that he pleaded guilty in 2003 to a crime involving crack cocaine distribution, Mr. Hearn contends that this volume of testimony was excessive and prejudicial.

Although we share Mr. Hearn's concern about the volume of Rule 404(b) evidence admitted here, we cannot say that the district court abused its discretion in admitting this evidence. The district court considered the issue of prejudice, and it articulated reasons for its conclusion that the evidence, *in toto*, was more probative than prejudicial here. Tr. at 21-22. The court did not address specifically the volume of the Rule 404(b) evidence admitted at trial; however, Mr. Hearn did not object to the evidence on that ground. Furthermore, the district court provided a limiting instruction at the time

that each witness testified regarding Mr. Hearn's prior convictions. We have held that such limiting instructions "are effective in reducing or eliminating any possible unfair prejudice from the introduction of Rule 404(b) evidence." *Jones*, 455 F.3d at 809. We ultimately must conclude that the district court did not abuse its discretion by admitting this evidence, despite its volume. *See Draiman*, 784 F.2d at 255.

**B.**

Mr. Hearn next contends that the Government failed to prove beyond a reasonable doubt that the substance at issue here was crack cocaine. He notes that not all cocaine base is crack, *United States v. Edwards*, 397 F.3d 570, 572-73 (7th Cir. 2005), and that the Government failed to produce any eyewitnesses or forensic analysts who could show that the substance had been mixed with baking soda or some other agent, boiled and dried in the process used to produce crack.

A challenge to the sufficiency of the evidence is a difficult task for a defendant. We shall reverse "only if, after viewing all of the evidence in a light most favorable to the government, and drawing all reasonable inferences therefrom, . . . a rational trier of fact could not have found the essential elements of the crime, beyond a reasonable doubt." *United States v. Morris*, 498 F.3d 634, 637 (7th Cir. 2007).

We have held that "the Government may prove that a substance is crack [cocaine] by offering testimony from people familiar with the drug." *United States v. Romero*, 469 F.3d 1139, 1153 (7th Cir. 2006) (quoting *United States v. Anderson*, 450 F.3d 294, 301 (7th Cir. 2006)). Such individ-

uals include the veteran narcotics agents and forensic chemists who testified here. *Id*. The Government presented testimony from a forensic analyst who had performed tests on the substance, from the officer who had seized the bag from the ground on the night of Mr. Hearn's arrest and from a DEA agent who examined the substance on the stand. Each of these witnesses testified that the substance in question appeared to be crack cocaine. The jury was permitted to infer from this evidence that the substance in question was, in fact, crack cocaine.

### C.

Mr. Hearn also challenges his sentence. He contends that the sentencing guidelines' disparate treatment of crack and powder cocaine lacks a rational basis and exhibits a discriminatory purpose by Congress. Subsequent to the filing of the briefs in this case, the Supreme Court held, in *Kimbrough v. United States*, 128 S. Ct. 558 (2007), that "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id*. at 575.

Before the Supreme Court's decision, the rule in this circuit was that a sentencing judge was not permitted, even under the liberalized regime of the *Booker* decision, to question the 100:1 crack/powder sentencing ratio. *See United States v. Miller*, 450 F.3d 270, 275-76 (7th Cir. 2006); *United States v. Hankton*, 473 F.3d 626, 629 (7th Cir. 2006). In *Kimbrough*, however, the Supreme Court held that the 100:1 ratio is not a statutory dictate; rather, it is a judgment of the Sentencing Commission that is entitled to respect but not uncritical acceptance. *Kimbrough*,

128 S. Ct. at 574; *see also United States v. Taylor*, 520 F.3d 746, 747 (7th Cir. 2008).

Because the district court sentenced Mr. Hearn before *Kimbrough* was issued, however, it would have had no reason to express any disagreement with the 100:1 ratio at the sentencing hearing. At that time, such a statement would have been futile under our precedent. The district court sentenced Mr. Hearn to 360 months' imprisonment, a sentence at the low end of the applicable guidelines range. It might have imposed a lesser sentence had it known that it was permissible to deviate from the 100:1 crack/powder ratio based on a disagreement with the policy. Mr. Hearn adequately preserved the *Kimbrough* issue, and therefore we shall remand to permit the district court to reconsider the sentence in light of *Kimbrough*. *See United States v. Padilla*, 520 F.3d 766, 774 (7th Cir. 2008); *see also Taylor*, 520 F.3d at 747.

### Conclusion

For the reasons explained in this opinion, we affirm Mr. Hearn's conviction, but we vacate the sentence and remand for re-sentencing in light of the Supreme Court's holding in *Kimbrough v. United States*, 128 S. Ct. 558 (2007).

AFFIRMED in part; VACATED and REMANDED in part