# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-1010

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CARLOS LEON WESLEY,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 824—**Robert W. Gettleman**, *Judge.*

———————

ARGUED MARCH 31, 2005—DECIDED SEPTEMBER 2, 2005

———————

Before FLAUM, *Chief Judge,* and POSNER and EVANS, *Circuit Judges.*

FLAUM, *Chief Judge.* Carlos Leon Wesley was convicted of three counts of bank robbery, for which the district court sentenced him to 57 months of imprisonment and 3 years of supervised released. In this appeal, Wesley challenges both his conviction and his sentence. For the reasons stated herein, we affirm the conviction and order a limited remand regarding Wesley's sentence pursuant to *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I. Background

On November 27, 1999, a man approached the TCF bank counter inside the Jewel Osco food store in Olympia Fields, Illinois. He showed bank teller Jeanette Butler a handwritten note that read, "This is a fucking stick-up." Butler responded, "You've got to be kidding me." To which the man replied, "I'm not." Butler handed him approximately $950 along with a dye pack. After the man left the store, Butler pushed the security alarm and informed her manager.

Butler was again working as a teller on May 17, 2000, when she recognized the man from the November robbery in line at the same TCF bank counter. Behind the counter, Butler kicked the other teller on duty, Janice DeBose, to try to warn her. Apparently not understanding why she had been kicked, DeBose told Butler to wait until she had finished with her customer. When the man reached the front of DeBose's line, he showed her a checkbook with a blue or black cover that had a handwritten note inside. The note said, "This is a fucking stick-up." DeBose gave the man the money in her top drawer along with a dye pack. After the man left, DeBose informed her supervisor and the police were called.

On September 27, 2000, a man approached bank teller Theresa Hicks at the same TCF bank counter and took from a checkbook a note with the following message: "This is a stick-up. Give me your hundreds, fifties, and twenties. And do not give me the dye pack." Hicks handed the man the money in her top drawer and also gave him a dye pack.

After the September 2000 robbery, the Olympia Fields Jewel Osco received an anonymous telephone call, the content of which the store manager passed on to FBI Agent Dan Lee. The caller reported seeing a man who appeared to detonate a "cherry bomb" or to use red spray paint in the Jewel Osco parking lot and then get into a white van and drive away. The caller also provided the license plate

number of the white van. Agent Lee traced the number and found that it matched a 1993 Mitsubishi registered to Carlos Wesley of 11555 South Ashland Avenue in Chicago, Illinois.

Soon thereafter, Agent Lee found a white van parked in front of 11555 South Ashland with the license plate number provided by the anonymous caller and with a reddish stain on its left front quarter-panel. Aware that the dye pack involved in the robbery contained red dye, Agent Lee called for back-up. Several hours later, Wesley and another man approached the van. When FBI agents presented themselves, the defendant identified himself as Carlos Wesley and the other man said that he was Wesley's brother. Wesley consented to searches of the van and his bedroom inside the house at 11555 South Ashland. Agents found a blue checkbook cover with a red stain in Wesley's bedroom and Wesley admitted that it belonged to him. Subsequent laboratory analysis of swabs from the red stains on the van and the checkbook cover indicated the presence of a substance of the same chemical composition as that contained in the dye packs used by the TCF bank.

Agent Lee created a photo array comprised of six photographs, including one of Wesley. He presented unmarked copies of the photo array to Butler and Hicks. Both bank tellers independently identified Wesley as the man who had robbed the TCF bank.

Following indictment and one mistrial, Wesley was tried on three counts of bank robbery in June 2003. All three bank tellers testified, recounting specific details about each of the bank robberies. Butler and Hicks each explained how they had picked Wesley's photograph from the photo array and DeBose identified Wesley in the courtroom. The government also introduced store surveillance videotapes showing the perpetrator of each robbery. The jury returned a verdict of guilty on each of the three counts.

Wesley moved for a judgment of acquittal and for a new trial. The district court denied both motions and sentenced Wesley to 57 months of imprisonment and 3 years of supervised released, and ordered him to pay restitution. Wesley appeals from the final judgment and sentence, arguing that the district court abused its discretion in denying his motion for a new trial and erred in treating the sentencing guidelines as mandatory contrary to *United States v. Booker*, 125 S. Ct. 738 (2005).

## II. Discussion

We review a district court's decision not to grant a new trial for abuse of discretion. *United States v. Mietus*, 237 F.3d 866, 870 (7th Cir. 2001). "If the court's decision rests on an error of law, however, then it is clear that an abuse of discretion has occurred, as it is always an abuse of discretion to base a decision on an incorrect view of the law." *Id.* (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)). "[O]ur review of this type of underlying legal ruling is non-deferential." *Id.* Wesley cites several alleged trial errors in arguing for reversal of his conviction. We discuss each in turn before considering the challenge to his sentence.

### A. Hearsay Testimony

During the first trial, which resulted in a mistrial, Wesley moved to exclude the content of the anonymous call describing a "white van" at the scene of one of the robberies and its driver who appeared to detonate a "cherry bomb." He argued both that it was inadmissible hearsay and that it should be excluded under Federal Rule of Evidence 403, emphasizing that this was the only direct evidence placing the van in the Jewel Osco parking lot. The government responded that the call fit within the excited utterance and

present sense impression hearsay exceptions. The district court ruled that the fact of the call could come in to explain the actions of law enforcement: "They didn't pull this number out of the thin air. And they're entitled to explain why they went to look at this vehicle and had the license number." The court held, however, that the content of the call could not be presented for the truth of the matter asserted therein. It explained:

> You could put into context the actions of both the manager of the store and the police officers without disclosing the actual substance of a conversation. So that's what they should say. "We got a call or the manager told us she had received an anonymous call, and based on that, we did X, Y, and Z."

The government elicited testimony in accordance with the court's ruling. There was no testimony that the anonymous caller described a white van or mentioned red paint or a "cherry bomb."

Before the start of the second trial, the government moved in limine for the admission of the content of the anonymous call, again arguing that the excited utterance and present sense impression hearsay exceptions applied. The court denied the motion. At trial, the government elicited the following testimony from Agent Lee:

> Q. Did you receive—what information did you receive from [the store] manager?
>
> A. She gave me a slip of paper which had a tag number written on it.
>
> Q. Did she tell you how she got that information?
>
> A. She'd received it through an anonymous phone call.
>
> Q. When you say "tag number," what is that?
>
> A. The plate on your car, the license plate.
>
> Q. Other than receiving a license plate number, was

there a description of the vehicle?

A.  They described it as being a white van.

At this point, defense counsel objected and requested a side bar. The court and counsel reviewed the transcript from the previous trial and found that the government had asked only about the steps law enforcement had taken after receiving the anonymous call, but had not elicited any information about the content of the call. The government agreed to question Agent Lee in this way once again. In the presence of the jury, the government proceeded:

Q.  Agent, let me go back and ask you two questions. The anonymous, the call, the information you got back from the Jewel manager that she received from the anonymous call gave you a license plate number, correct?

A.  That's correct.

Q.  Then you also at some point began to look for a white van, correct?

A.  Correct.

Defense counsel again objected and asked that the testimony be stricken because it revealed that the anonymous caller had referred to a "white van." The judge sustained the objection, directed the government to question Agent Lee exactly as it had in the first trial, and gave the following instruction to the jury:

> We're going to strike the testimony and the questions that were asked immediately after the first sidebar we took this afternoon. So I want you to disregard all those questions. We're going to start this line of questioning over again. So I'm instructing you to disregard those questions and answers and just pay attention to what [the government] is about to do now.

The government questioned Agent Lee as follows:

Q. Agent, when you were at the scene of the September 27, 2000 investigation, the bank robbery, did you speak with a manager from the Jewel store?

A. Yes, I did.

Q. Did you receive some information that she received from an anonymous call?

A. Yes, I did.

Q. Based on the information you received, what did you do?

A. I took that information and ran it in what we call the National Crime Information Center computer.

Q. And the information you got was a license plate number, correct?

A. That's correct.

Q. What was the license plate number?

A. YNL 553, Illinois plate.

Q. When you ran it through the computer, law enforcement databases, what information did you receive regarding that license plate number?

A. That it was registered to a 1993 Mitsubishi. The owner was Carlos Wesley at 11555 South Ashland in Chicago, Illinois.

Defense counsel made no further objections to this line of questioning.

Wesley argues that he was prejudiced because the court did not strike the testimony before the first side bar and because reference to the "white van" was, in his words, a "bell twice rung that could not be 'unrung.'" The testimony, he asserts, placed Wesley's white van near the scene of the crime and made it impossible for defense counsel to argue, as he had in the first trial, that the government failed to

make this connection. There was no other direct evidence placing the van in the Jewel parking lot because the license plate was registered to a different vehicle, a 1993 Mitsubishi.

The government argues that, although the court may have misspoken when it struck only "the testimony and questions that were asked immediately after the first sidebar," instead of the testimony and question immediately before and after the first sidebar, it clearly communicated to the jury that it was to disregard the entire line of questioning and to "just pay attention to what [the government] is about to do now." We need not determine, however, whether the judge erred in admitting evidence or by giving an incomplete curative instruction because any such errors were harmless. *See* Fed. R. Crim. P. 52(a); *United States v. Lamarre*, 248 F.3d 642, 649 (7th Cir. 2001) ("We will not reverse unless the [evidentiary] error affected substantial rights . . . or had a substantial or injurious effect or influence on the jury's verdict.") (internal quotations and citations omitted).

Defense counsel did not object at trial, and presents no challenge now, to Agent Lee's testimony that the anonymous caller provided a license plate number that was registered to Wesley at his home address. When Agent Lee went to this address, he found this license plate on a vehicle that had a reddish stain on the left front quarter-panel. Testing revealed that the stain contained a substance of the same chemical composition as that used in the TCF Bank's dye packs. This is strong circumstantial evidence that the vehicle found by Agent Lee, the white van, was present at the scene of at least one of the robberies. The caller's statement that the license plate was on a white van made very little difference in the context of the rest of the evidence presented at trial, including strong eyewitness testimony that placed Wesley himself at the scene of all three bank robberies. Therefore, assuming without deciding

that the evidence was inadmissible and that the curative instruction did not effectively inform the jurors that they should disregard the testimony immediately before and after the first side bar, we hold that the errors were harmless.

## B.  Government's Closing Argument

Wesley argues that he is entitled to a new trial because of improper statements made by the prosecutor in closing argument. In reviewing a prosecutor's remarks, we first must look at them in isolation to determine whether they stayed within proper bounds. *Mietus*, 237 F.3d at 870. If the remarks violated one of the defendant's specific trial rights, such as the Fifth Amendment right against self-incrimination, then "the court may hold the error harmless and uphold the conviction only if the government proves beyond a reasonable doubt that the defendant would have been convicted absent the unconstitutional prosecutorial comments." *Id.* If the remarks are instances of general prosecutorial misconduct, but do not implicate a specific constitutional right, then we consider the remarks in light of the entire record to determine if the defendant was deprived of a fair trial; that is, we ask "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotations omitted).

Wesley presents what he contends is one example of each type of prosecutorial overstepping. First, he argues that the prosecutor violated the Fifth Amendment by indirectly commenting on his decision not to testify. Second, he asserts that the government's suggestion that defense counsel made racist comments was an instance of general prosecutorial misconduct and so infected the trial with unfairness as to constitute a denial of due process.

### 1. Fifth Amendment Right Against Self-Incrimination

During closing arguments, defense counsel referred to Wesley's brother as a crack addict who previously had robbed Wesley. He also said that Wesley's brother had access to Wesley's van and bedroom. He then added: "[Y]ou all know what drug addicts are capable of. You know how much they need money. I mean, who knows? Are we saying that his brother did it? No. But is there reasonable doubt based on his brother? Of course there is." He also noted that the fingerprints taken from the bank did not match Wesley's, and that law enforcement had not checked the prints against the brother's. At the end of his closing argument, defense counsel suggested that Wesley's brother or one of his brother's "drug associates" may have borrowed Wesley's van and committed the three bank robberies.

The following occurred during the prosecutor's rebuttal argument:

[Gov.]:    Let me just briefly address the argument that defense counsel has now thrown out there about his brother, and that, too, is meant to be an enormous distraction for you, meant to distract you from the very strong evidence in this case.

Well, you know what, if the brother is supposed to be the one responsible, the brother looks like him, where is the brother? Where is he?

[Def.]:    Judge, I'm going to object. We don't have the burden of proof, and that's an unfair comment.

[Gov.]:    Your Honor, they have subpoena power.

The Court: Overruled.

[Gov.]: They have subpoena power just like the government does. They can issue subpoenas to this trial and bring witnesses in here through the power of the Court.

[Def.]: Judge, and I'm also going to object because we didn't put that evidence in, and this argument—

The Court: But you did argue it . . . and this is argument. Overruled.

[Gov.]: They could have brought, they could have subpoenaed the brother and brought him here and put him up there on the witness stand and asked him questions. And you could have seen what he looks like. You don't have—you haven't seen or heard any evidence at all about what he looks like other than he was a black man. Is he the same? Does he at all look like the defendant? You have no evidence of that at all. You don't know anything about him.

After closing arguments, and outside of the presence of the jury, defense counsel renewed his objection. The district court said that the government's comments were "fair" and explained: "[W]e all have seen [the video], we all have seen Mr. Wesley, you know, there are resemblances there, so you're inviting them to believe that Mr. Wesley's brother resembles both him and the fellow on the videotape, and I think it's fair to comment." Defense counsel then moved for a mistrial and the district court denied the motion.

Wesley argues that the prosecutor's comments about his failure to call his brother or to present evidence of his brother's appearance shifted the burden of proof to the defense. We have explained that this kind of comment does not really change the burden; the district court correctly instructed the jury that the prosecutor bears the burden at

all times. *See United States v. Sblendorio*, 830 F.2d 1382, 1391 (7th Cir. 1987). Rather, Wesley's real complaint, which he identifies later in his brief, is that the prosecutor's argument adversely affected the exercise of his right against self-incrimination and should be held unconstitutional under *Griffin v. California*, 380 U.S. 609 (1965), which forbids the government from inviting the jury to draw an adverse inference from a defendant's decision not to testify.

The rule of *Griffin* prohibits indirect as well as direct invitations to draw an adverse inference from a defendant's decision not to testify. *See Mietus*, 237 F.3d at 871. For example, a prosecutor's comment about the defense's failure to present evidence will violate this rule if the only person who could have provided the evidence was the defendant through his own testimony. *Id.* We have held, however, that there will be no violation of the right if the defense opens the door by commenting on the government's failure to call a witness or to present evidence on a given issue, the prosecutor responds by commenting that the defense could have subpoenaed the witness or presented other evidence on the issue, and that witness or evidence was available to the defendant. *See Sblendorio*, 830 F.2d at 1392-94.

Despite Wesley's assertion to the contrary, it is clear that defense counsel opened the door to the prosecutor's comments. As the district court understood, defense counsel was trying to get the jury to believe that Wesley's brother had features similar to Wesley's and could have been the person in the bank surveillance videos. He described the brother's motive and opportunity to commit the crimes and said that the government should have compared his fingerprints to those found at the bank, suggesting that it was within the government's power to present evidence excluding the brother. When the government responded by pointing out that the defense has "subpoena power just like the government does" and could have presented evidence

about the brother, it merely provided information that the jury is entitled to know. *Sblendorio*, 830 F.2d at 1393-94.

In addition, Wesley has presented nothing to indicate that his brother was not available. We do not agree with Wesley that the possibility that his brother might have invoked his Fifth Amendment privilege against self-incrimination made the prosecutor's comments improper. First, there is nothing in the record indicating that Wesley's brother would have invoked the privilege. Second, while Wesley's brother could not have been compelled to provide self-incriminating testimony, he could have been compelled to provide evidence of his physical characteristics. *See United States v. Jackson*, 476 F.2d 249, 253 (7th Cir. 1973) ("From a constitutional standpoint, it is well-established that a person may lawfully be compelled to exhibit or demonstrate physical characteristics."). At the very least, Wesley could have presented photographs or a video of his brother so that the jury could compare him to Wesley and to the man on the bank surveillance videos. *See Pennsylvania v. Muniz*, 496 U.S. 582, 591-92 (1990) (admission of videotape of defendant did not infringe right against self-incrimination). Alternatively, Wesley could have called a witness to testify to the appearance of both brothers or could have asked the court to compel his brother to participate in a lineup prior to trial. *See United States v. Wade*, 388 U.S. 218, 222 (1967) ("We have no doubt that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance."). Wesley may even have been able to call his brother to allow the jury to make an in-court comparison of the two. *See United States v. Lumitap*, 111 F.3d 81, 84 (9th Cir. 1997) (holding that government can compel defendant's presence at trial for identification purposes and collecting cases from other jurisdictions to the same effect); *see also Jackson*, 476 F.2d at 253 (reviewing Supreme Court cases and noting that

they "would seem to support a requirement that defendant appear in court for identification . . . ."); *Schmerber v. California*, 384 U.S. 757, 764 (1966) (noting that "both federal and state courts have usually held that [the Fifth Amendment] offers no protection against compulsion . . . to appear in court."). The prosecutor simply made clear that, just as the government could have presented evidence excluding the brother, Wesley could have presented evidence other than his own testimony linking his brother to the robberies. As in *Sblendorio*, the defense opened the door by suggesting that Wesley's brother could have been the man on the bank surveillance videos and commenting on the government's failure to call a witness or to present evidence excluding the brother, the prosecutor responded by commenting that the defense could have subpoenaed the brother or presented other evidence of the brother's appearance, and the brother or other evidence of his appearance was available to Wesley. 830 F.2d at 1392-94. Accordingly, there was no violation of Wesley's Fifth Amendment right against self-incrimination.

### 2. Suggestion that Defense Counsel Made Racist Comments

At trial, bank teller Janice DeBose made an in-court identification of Wesley. On cross-examination, defense counsel elicited that DeBose knew that Wesley would be present in court and asked, "and that's the only black man sitting at this table, isn't it?" DeBose answered affirmatively. On re-direct, DeBose testified that she identified Wesley based on her memory of his physical appearance, not because he was the only black man at the defense table. During closing arguments, the government pointed out that the evidence against Wesley included the eyewitness

testimony of three bank tellers. The prosecutor then said: "[D]o they seem like people to you who would just flippantly pick anybody out of a photo array, just take the witness stand and point at the defendant because he's the only black man at the table? And that, folks, to insinuate that is insulting."

In his closing remarks, defense counsel questioned the validity of the eyewitness identifications, stating, "I'm sorry that [the prosecutor] is insulted that Ms. DeBose picked out Carlos Wesley, but forget about being insulted or not, the question you need to ask yourself is: Is that the kind of ID, in-court ID that you want to rely on for proof beyond a reasonable doubt?" He told the jury that DeBose made her in-court identification of Wesley within seconds of being asked who had robbed her and emphasized that it had been three years since the robbery and that Wesley was sitting some distance from her in the courtroom. The following occurred in the prosecutor's rebuttal argument:

> [Gov.]: And to suggest that any [of the witnesses], that Ms. DeBose especially would get up on that witness stand under oath and say something other than the truth, it insults her, and it insults the oath that you, too, took as jurors. To suggest that she picked the defendant out because he is the only black man sitting at counsel table, it is insulting, and you should be insulted by that argument.
>
> [Def.]: Judge, I'm going to object to that. . . .
>
> The Court: Excuse me?
>
> [Def.]: I object to her saying the jury should be insulted by it.
>
> The Court: Well, let's not get personal.
>
> [Gov.]: Ms. DeBose, who you saw as a black

woman herself, to suggest that she would just pick out the defendant because he was the only black man sitting at counsel table, it's just, it's just wrong, and it is insulting, and you should disregard that. You should disregard that argument.

Wesley argues that the prosecutor's statements were made in an attempt to inflame the jury by suggesting that defense counsel was using racist arguments that should insult the jury. This, Wesley asserts, was an attack on the integrity of defense counsel and deprived him of a fair trial. "As a general matter, improper comments during closing arguments rarely rise to the level of reversible error, and considerable discretion is entrusted to the district court to supervise the arguments of counsel." *United States v. Amerson*, 185 F.3d 676, 685-86 (7th Cir. 1999) (internal quotations omitted). "A new trial is required only if the improper comments prejudiced the defendant's right to a fair trial." *Id.*; *see also Darden*, 477 U.S. at 181 ("[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. . . . The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.") (internal citations and quotations omitted).

Wesley relies on *Sblendorio*, where the prosecutor's rebuttal argument was filled with "caustic" statements, including, "I can't believe some of these defense attorneys stood up in front of you with straight faces." 830 F.2d at 1395. We explained that, although the prosecutor can call defense arguments "lame," "he was not entitled to add to that by suggesting that the defense lawyers would start sniggering as soon as they were out of the jurors' view." *Id.* We nevertheless found that the statement did not deprive the defendant of a fair trial because its effects could be only minimal given its context in the course of a multi-day trial.

In this case, defense counsel suggested that DeBose's in-court identification of Wesley may have been affected by the fact that he was the only black man at the defense table. In her closing argument, the prosecutor not only argued that the identification was accurate and should be believed by the jury, but also used inflammatory language to make jurors think that defense counsel was insulting them by emphasizing race. This, the prosecutor should not have done. No proper purpose is served by trying to make the jurors feel that they have been insulted by the defense. Nevertheless, the underlying point—that jurors may judge for themselves the credibility of the prosecution witnesses and whether it seems likely that these witnesses would make a false identification, intentionally or otherwise—is appropriate. Furthermore, we cannot say that the prosecutor's comment was more inappropriate than the comment in *Sblendorio*. There, the prosecutor suggested that the defense attorneys were willing to mislead the jury with impossible arguments, and accompanied this accusation with other "caustic" statements. Here, the prosecutor suggested that defense counsel was being distasteful, but did not impugn his honesty. In addition, unlike in *Sblendorio*, the prosecutor's comment in this case was not accompanied by other "caustic" statements. While the prosecutor should have chosen a less inflammatory way of responding to defense counsel's challenge to DeBose's in-court identification, the solitary statement did not so infect the trial with unfairness as to make the resulting conviction a denial of due process.

## C. Juror Bias

During the second day of jury deliberations, one of the jurors, Juror Roberts, sent out the following note: "[Juror Soler] told us that he had been robbed by an employee last night. Checks were stolen, and his account was depleted. He

spent last night doing police reports. My question: Can he be fair?" The judge talked to Juror Roberts in chambers in the presence of one attorney from each side (Wesley waived his right to be present). After asking Juror Roberts how she had learned about what had happened to Juror Soler, the judge asked her whether this event would affect her ability to be fair. She replied that it would not. The judge then sent Juror Roberts back to the jury room and brought Juror Soler into his chambers. Before doing so, however, the judge explained to counsel for both sides that he planned to ask Juror Soler, and later all of the other jurors, if they still could be fair and impartial. Defense counsel said, "That sounds about right."

After hearing Juror Soler's description of the theft by his employee, the judge asked, "do you think that this experience would have any effect on your ability to be fair to both sides?" He responded that it would not. The prosecution and defense both declined the judge's invitation to ask Juror Soler questions and he was returned to the jury room.

With all parties present in chambers, the judge asked if anyone had any thoughts about the situation. The prosecutor stated that he did not hear anything that would give him pause. Defense counsel expressed some concern about the similarity between the crime committed against Juror Soler and the bank robberies for which Wesley was being tried. The judge then stated that he believed that Juror Soler could keep the event separate from the task at hand, and said, "I wanted to know whether you had any motion or request regarding [Juror Soler] and what he told us." Finally, the judge said that he would talk to the entire jury and "tell them that we have spoken to [Juror Soler], and that I'm convinced that [Juror Soler] can be fair and impartial despite the unfortunate experience he had last night." The court asked if there were any objections and defense counsel said, "I think that's fine."

In open court and in the presence of the jury, the judge said:

> As you know, there are a couple of matters that we have to discuss, and one of them involves [Juror Soler] and his experience last night. And I just want you all to be assured that we have spoken to [Juror Soler] about that, and he has assured us, and I am quite confident and comfortable with his assurance, that his experience of last night will not affect his ability to be fair and impartial. And so we are not going to take any action as a result of that. I want to make sure you all know that, and if there is anybody among you who has any problems with that, I'd like you to let me know right now.

No juror expressed any concerns, and neither defense counsel nor the prosecutor objected or made any motion to the court.

Wesley now argues that juror bias must be presumed from the events that transpired during deliberations. He acknowledges that he did not object during trial and asserts that his forfeited argument should be reviewed for plain error. The government contends that Wesley waived his right to raise this issue on appeal.

"Waiver and forfeiture are related doctrines; waiver occurs when a defendant intentionally relinquishes or abandons a known right, whereas forfeiture occurs when a defendant fails to timely assert his rights." *United States v. Pappas*, 409 F.3d 828, 829 (7th Cir. 2005) (internal quotations and citations omitted). "A forfeiture is basically an oversight; a waiver is a deliberate decision not to present a ground for relief that might be available in the law." *United States v. Cook*, 406 F.3d 485, 487 (7th Cir. 2005). "While we review forfeited issues for plain error, we cannot review waived issues at all because a valid waiver leaves no error for us to correct on appeal." *Pappas*, 409 F.3d at 830 (internal quotations omitted).

Here, the judge and the parties gathered in chambers to discuss what should be done regarding Juror Soler's experience. The judge sought the guidance of both parties, asked if there were any motions, and proposed a plan for proceeding. Defense counsel did not accept the court's invitation to make a motion and instead responded that the proposed plan was "fine." Thereafter, the district court did exactly what it had said it would do and defense counsel did not object. Wesley does not claim that the situation was confusing or that defense counsel did not understand what he was agreeing to. It was clear from his comments in chambers that defense counsel understood that the question of juror bias was at issue. The court expressly asked defense counsel if he approved of its plan and gave him the opportunity to make a motion or to suggest an alternative plan. Clearly aware of what was at stake, defense counsel declined to do so and agreed to the approach proposed by the court. We find that, through his counsel, Wesley intentionally relinquished his right to challenge the makeup of the jury based on Juror Soler's experience during deliberations. Accordingly, there can be no error for us to correct on appeal.

## D.  Sentencing

Finally, Wesley contends that the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), necessitates resentencing. Because Wesley did not raise this or a related challenge to his sentence before the district court, we review for plain error. *United States v. Paladino*, 401 F.3d 471, 481 (7th Cir. 2005). Under the plain error test, "before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Cotton*, 535 U.S. 625, 631 (2002) (internal quotations and citation omitted). "If all three conditions are met, an appellate court

may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

Wesley's challenge rests on the district court's treatment of the Guidelines as mandatory. As we have made clear, "the mandatory, as opposed to advisory, application of the Guidelines constitutes error that is plain." *United States v. Schmeilski*, 408 F.3d 917, 921 (7th Cir. 2005). In addition, "[i]f a defendant has been prejudiced by an illegal sentence, then allowing that illegal sentence to stand would constitute a miscarriage of justice." *Id.*; *see also Paladino*, 401 F.3d at 483. Thus, we need only determine whether the sentencing court, operating under the discretion permitted by *Booker*, would have sentenced Wesley differently. On this record, we cannot be certain that the same sentence would have been imposed. Accordingly, while retaining jurisdiction, we order a limited remand to permit the sentencing court to determine whether it would have given Wesley a lower sentence had it understood the Guidelines to be merely advisory. The sentencing court should proceed on remand in accordance with the procedure set forth in *Paladino*.

## III. Conclusion

We AFFIRM Wesley's conviction and order a LIMITED REMAND in accordance with *Paladino* to obtain a determination as to whether the district court would have entered a lower sentence had it known that the Guidelines are advisory.

A true Copy:
Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*