In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1477

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LARRY G. SMITH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 05 CR 179—**Rudy Lozano**, *Judge.*

ARGUED JANUARY 9, 2009—DECIDED APRIL 17, 2009

Before MANION, ROVNER, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Larry G. Smith pleaded guilty to one count of distributing child pornography in violation of 18 U.S.C. § 2252(a)(2) after law enforcement officers discovered more than 3,000 images of child pornography on Smith's computer hard drives, which had been set up to share the images over the internet. The district court sentenced Smith to 240 months' imprisonment. Smith appeals his sentence. We affirm.

I.

Larry Smith first came to the attention of law enforcement officials when an FBI agent entered an internet chat room devoted to preteen sexual pictures. Inside the chat room, the agent was able to exchange dummy files (files that could not be opened but had names suggesting that they contained child pornography) for actual images and videos of child pornography. Further investigation revealed that the computer operating the server which distributed the child pornography was located at Smith's house.

When, in the early morning hours, agents executed the warrant they obtained to search the house, they found Smith in his bedroom with a 16-year-old girl. They also found two books about Adolph Hitler and satanic rituals, a loaded handgun, and six computers. One of the computers' hard drives contained approximately 3,114 images of child pornography, while another computer had over 500 images on its hard drive. The pictures included many of prepubescent children—as young as two years old—violently being forced to engage in sexual conduct, several of prepubescent children in bondage with their genitals exposed, and two of an animal engaging in a sex act with a young girl. In addition to the images, the hard drives also contained 40 videos of child pornography. One video featured two screaming children being raped by an adult; another depicted a naked three-year-old girl being forced to perform a sex act on an adult male.

Smith was indicted and his trial scheduled for January 17, 2006. After several continuances, Smith moved on July

20, 2006, for funds under the Criminal Justice Act ("CJA") to retain a psychological expert. The court granted his request on August 1, 2006. Following several more continuances, Smith pleaded guilty on March 2, 2007, to the third count of the indictment, distributing child pornography in violation of 18 U.S.C. § 2252(a)(2).

Smith's sentencing proceeded in four parts over a four-month span. At the first hearing, held October 4, 2007, Smith presented the expert testimony of Robert Hundt, a licensed clinical social worker and certified addictions counselor. Relying upon a "psychosexual assessment" of Smith he had previously completed, Hundt opined that Smith was treatable and therefore should only be incarcerated for a short time. Hundt admitted, however, that little research—and no credible testing—was available to aid in determining whether someone like Smith posed a risk of committing future offenses involving child pornography. He also stated that he had "absolutely no[ ]" idea what the appropriate amount of punishment was for Smith.

The district court held a second hearing on November 15, 2007. At that hearing, the district court determined Smith's guidelines offense level was 38, yielding a sentencing range of 235 to 293 months' imprisonment. The court then invited Smith's attorney to "address and comment" on any of the 18 U.S.C. § 3553(a) factors. When a discussion of the district judge's role in sentencing vis-à-vis the guidelines arose shortly thereafter, the district court had the following exchange with Smith's counsel, Mr. Foster:

THE COURT:   I say the Court can go higher or I can
             go lower than the guidelines. That's
             not the party[.] I can go higher or
             lower for several reasons, for no other
             reason that I disagree that they're
             fair, or that there are reasons why
             I should be higher or lower. But,
             again, that's not a departure.

MR. FOSTER:  Right.

THE COURT:   The word "depart" insinuates to me
             that the guidelines are ironclad. I
             don't consider them to be ironclad.

Shortly after that exchange, Foster appeared to advocate
that the district court had the authority to completely
disregard the guidelines. The district judge jumped in:

THE COURT:   Technically, Mr. Foster, I don't know
             that I agree with you on that. I think all
             that tells me is that it's up to me to
             decide what's a fair sentence.

MR. FOSTER:  Up to you to decide what's a fair sen-
             tence with total disregard for the
             guidelines. . . . And I believe that with
             Rita and Miranda after that, that a
             district court judge at this stage can
             simply enter a sentence with no con-
             cern—

THE COURT:   I don't think I have to ignore the guide-
             lines, Mr. Foster.

MR. FOSTER: You don't have to.

THE COURT: I can consult them. I can look at them. I can determine whether they enlighten me as to what a fair sentence is. Or if I want to ignore them, I still have to—the bottom line, I have to make a determination what a fair sentence would be.

MR. FOSTER: Right.

THE COURT: The guidelines are advisory.

The discussion then turned to Hundt's qualifications. The district judge stated that he "had some difficulty accepting" Hundt as an expert because Hundt was neither a psychiatrist nor psychologist, and the defense had not shown that he was "qualified to make the diagnosis and the prognosis that he was making." The court then gave Foster an opportunity to flesh out Hundt's qualifications and took a ten-minute recess. After the break, Foster stated that he wanted to address why the court should accept Hundt as a non-scientific expert. The court responded:

You can address it. But like I said, I will go through it, but if you are going to address why you think Mr. Hundt is an expert, I want to know why he's an expert, what he said, and how he drew the conclusion because there are a lot of comments that he made from a self-answered questionnaire by the defendant. And from that it appeared, at least—and I'm going back from recollection right now, that one diagnosed

the problem which he may be able to do, psychologists do that to some degree, and then talks about his cure and everything else. I didn't hear any expertise on that, whether or not prison is going to be good for him or bad for him, and whether or not he can be cured in prison.

Having spelled out his concerns about Hundt's qualifications, the district judge then launched into this aside:

Now, my experience from dealing with people that I have sent to institutions is that the institutions have experts in all these fields, and they determine whether people are treatable, how long they're treatable, and if they're cured, then they can—they can release somebody I had given life to at any time. I can't make them hold onto a person. Once he hits the Bureau of Prisons, it's up to the Bureau of Prisons how long they're going to keep them up to the maximum that I give.

Smith's attorney quickly attempted to correct the district judge, explaining that since the abolition of parole boards, a person may not be released early from a federal prison short of having served 85% of his sentence. The district judge, referencing a pre-guidelines case as the basis of his understanding, reiterated that he thought "the Bureau of Prisons ha[s] a lot of say," but noted "that's neither here nor there."

The possibility of Smith being released earlier than the 85% threshold was discussed one more time near the end of the November 16 hearing:

MR. FOSTER:  Are we—and you said maybe they'll let him loose early. Judge, I don't believe they will.

THE COURT:  I said they could.

MR. FOSTER:  They could. They could.

THE COURT:  I don't have any basis to say they're going to let him out early.

For the remainder of the sentencing proceedings, the subject of whether Smith might be released earlier than upon serving 85% of his sentence was never broached.

Unable to convince the court of Hundt's qualifications, Foster moved for a continuance to find another expert. The court denied the motion:

THE COURT:  Mr. Foster, respectfully, I've given numerous continuances on this case. I gave you time to go out and get an expert. I even authorized funding for the expert.

MR. FOSTER:  Correct.

THE COURT:  Every time I come up and tell you, well, that expert is not believable or does not meet the necessary qualifications based upon what he said, his background didn't impress me insofar as his testimony is concerned, I'm not going to keep giving you continuances until, you know, you find somebody either I get tired of saying I'm not

> impressed by him or that, you know, you're satisfied with. That's not the way it works, Mr. Foster. I gave you a chance to go there and get somebody.

Before the second sentencing hearing concluded, the court and Foster had yet another discussion about 18 U.S.C. § 3553(a) and its relationship with the guidelines. The court observed that, before *Booker*, "[i]t was a lot stricter." The court also pointed out "that the guidelines [are] only advisory, and I can take a look at them as to what a fair sentence will be." To those observations, Foster replied: "I guess what I'm saying is I couldn't have stood here pre-Booker and with integrity ask you to ignore these guidelines, which is what I'm asking you to do . . . ." The court responded: "You could've done it. You may not have gotten as far as you do today. It might be a polite way of saying we agree."

The court held a third sentencing hearing the next day and gave the government an opportunity to respond to the sentencing issues raised by the defense. The court did not convene again until nearly three months later when, on February 11, 2008, it pronounced its sentence. The court orally stated, in detail, its reasons for selecting its sentence. It considered, among other things, the nature and circumstances of the crime itself, including the duration of Smith's operation of the child pornography-sharing server, the planning that went into creating the server and organizing the images, and the unusually appalling nature of some of the images and videos depicting violent sexual acts perpetrated on very young children.

The court also considered the resulting consequences of the crime as well as the fact that Smith committed the crime within a week of being freed on bond from state custody. After discounting Hundt's testimony because of his lack of qualifications, the court found that a 240-month sentence was "fair and reasonable given the nature and circumstances of the crime" and would "have a deterrent effect for others creating, down-loading[,] and trading child pornographic images." The court noted that "the guideline range coincides with the sentence and findings this Court has made and deter-mined to be fair and reasonable." Smith appeals his sentence.

## II.

On appeal, Smith presents four challenges to his sentence. First, he argues that the district court should have granted him a continuance to obtain another expert after the court discredited Hundt. Smith does not, however, challenge the district court's rejection of Hundt's qualifica-tions—only the denial of the continuance to find a new expert.

Whether to grant or deny a continuance is a matter of case management. *United States v. Tanner*, 544 F.3d 793, 795 (7th Cir. 2008). Management decisions "are for the district judge; we intervene only when it is apparent that the judge has acted unreasonably." *Griffin v. Foley*, 542 F.3d 209, 217 (7th Cir. 2008) (quoting *N. Ind. Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 269 (7th Cir. 1986)). Accordingly, this court "will overturn a trial court's

disposition of a motion to continue only for an abuse of discretion and a showing of actual prejudice." *United States v. Tingle*, 183 F.3d 719, 723 (7th Cir. 1999) (quoting *United States v. Blandina*, 895 F.2d 293, 297 (7th Cir. 1989)); *see also Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) ("[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." (internal quotations omitted)).

The district court did not abuse its discretion in refusing to give Smith another bite at the expert apple. The court had already afforded Smith a fair opportunity to present expert testimony. It had authorized CJA funds to retain an expert and had given him plenty of time—over a year[1]—to find a qualified expert. *Cf. United States v. J.H.H.*, 22 F.3d 821, 831 (8th Cir. 1994) (finding no abuse of discretion where district court gave defendant a month between trial and sentencing to obtain a psychological evaluation). Having given Smith a fair opportunity to retain a suitable expert, the court was under no obligation to let him have *another* chance to present expert testimony—especially when public money had already been expended. "If at first you don't succeed, try, try, again" might make a memorable maxim, but it is ill-suited as a principle for case management.

---

[1] The presiding magistrate judge granted Smith's motion seeking CJA funds to retain an expert on August 1, 2006—more than a year before sentencing began.

Additionally, Smith gave the district court no reason to believe that he could ever succeed in finding a satisfactory expert. *See United States v. Rinaldi*, 461 F.3d 922, 929 (7th Cir. 2006) (observing that, when considering whether prejudice arises from the denial of a continuance, a court can look to "the likelihood that additional time would have yielded information useful at sentencing"). Smith's attorney told the court that he had shopped around and that Hundt was the only person in Northwest Indiana who performed psychosexual assessments. Moreover, Hundt himself admitted on the record that not much research existed on the question of whether someone like Smith was a potential risk to commit future offenses involving child pornography. He also explained to the district court that experts had yet to devise testing that would provide insight into the question of future risk. Given Hundt's testimony about the dearth of testing and studies on precisely the issue on which Smith sought the aid of expert testimony, the district court was well within the bounds of reason to conclude that Smith had little chance of finding a credible expert. Smith has submitted nothing to call into question the reasonableness of that conclusion; he therefore has not shown that he was prejudiced by the denial of the continuance.

Next, Smith argues that the district court erred by treating the guidelines as presumptively applicable. Whether the district court followed the proper procedures after *United States v. Booker*, 543 U.S. 220 (2005), in imposing sentence is a question of law we review de novo. *United States v. Mendoza*, 510 F.3d 749, 754 (7th Cir. 2007). The Supreme Court set forth the proper process for deter-

mining a sentence in *Rita v. United States*, 127 S. Ct. 2456 (2007), and *Kimbrough v. United States*, 128 S. Ct. 558 (2007). First, the district judge will normally begin by considering the presentence report and its interpretation of the guidelines. *Rita*, 127 S. Ct. at 2465. The Supreme Court has stressed that "district courts must treat the Guidelines as the 'starting point and the initial benchmark.'" *Kimbrough*, 128 S. Ct. at 574 (quoting *Gall v. United States*, 128 S. Ct. 586 (2007)). After considering the guidelines, the district court will then subject the defendant's sentence "to the thorough adversarial testing contemplated by the federal sentencing procedure." *Rita*, 127 S. Ct. at 2465. The district court accomplishes that task by hearing arguments from the prosecution and defense that a guidelines sentence should not apply—because the case falls outside the heartland of the guidelines, or because a guidelines sentence fails to reflect the § 3553(a) factors, "or perhaps because the case warrants a different sentence regardless." *Id*. The Supreme Court stated that, "[i]n determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id*.

To support his argument that the district court, contrary to the Supreme Court's proscription, applied a legal presumption in favor of the guidelines, Smith cites an exchange between his counsel and the district judge during the first sentencing hearing:

> MR. FOSTER: Right. But that's where I'm headed. I know that you have—yeah, there's

certain parameters on that, and you're going to have a choice between the mandatory minimum and whatever the statutory limit is here.

THE COURT: No. I have to go back to the guidelines. You better tell me why the guidelines are improper.

That exchange occurred while the court was attempting to understand the relevance of Hundt's testimony to Smith's sentencing. At first blush, the court's statements may give the impression that the district judge misapprehended his role post-*Booker* and placed undue emphasis on the guidelines.

An examination of the sentencing proceedings in their entirety, however, dispels any doubt that the district court incorrectly understood, or improperly applied, the procedural framework outlined in *Rita*. The district judge's statements during the second sentencing hearing show that he understood the proper role the guidelines play in sentencing. During the presentation of mitigating factors by Smith's counsel, the district judge stated that he could go higher or lower than the guidelines "for no other reason than I disagree that they're fair, or that there are reasons why I should be higher or lower." He also stated that he did not consider the guidelines to be "iron-clad." And when Smith's counsel appeared to be insinuating that the district court could completely disregard the guidelines, the district judge clarified that he did not "have to ignore the guidelines," while at the same time recognizing that "it's up to me to decide what's a fair sentence." *Cf. Kimbrough*, 128 S. Ct. at 574.

The district court's actions support its statements. The court first calculated the guidelines range. It then gave counsel for both sides an opportunity to address any of the § 3553(a) factors they believed were relevant to sentencing, as well as any objections they had to the guidelines range. When it pronounced its sentence, the district court gave a whole host of reasons consistent with the § 3553(a) factors. *See, e.g.*, 18 U.S.C. § 3553(a)(1) (nature and circumstances of the offense and the history and characteristics of the defendant); *id*. (a)(2)(A) (seriousness of the offense and just punishment for the offense); *id*. (a)(2)(B) (adequate deterrence). It then noted that "the guideline range coincides with the sentence and findings this Court has made and determined to be fair and reasonable." Far from evincing a presumption that the guidelines applied, the district court's statements and actions show that the court arrived at a sentence it believed was fair independently of the guidelines, though with due consideration for what the guidelines prescribed.

Smith also argues that the district court failed to adequately address the § 3553(a) factors. Specifically, Smith takes issue with the district court's failure to discuss all of the mitigating circumstances surrounding the offense. He contends that, as a consequence of that failure, the sentence the district court imposed was not reasonable.

A district judge must allow a defendant to point out any of the § 3553(a) factors that might justify a sentence outside of the guidelines range, and must consider those factors when determining the sentence. *United States v. Tyra*, 454 F.3d 686, 687 (7th Cir. 2006). But the judge need

not "write a comprehensive essay applying the full pano-
ply of penological theories and considerations, which is
to say everything invoked or evoked by section 3553(a)—to
the case before him." *United States v. Dean*, 414 F.3d 725,
729 (7th Cir. 2005). Instead, the district judge need only
give an "adequate statement of the judge's reasons,
consistent with section 3553(a), for thinking the sen-
tence that he has selected is indeed appropriate for the
particular defendant." *Id.*; *see also United States v. George*,
403 F.3d 470, 472–73 (7th Cir. 2005) ("Judges need not
rehearse on the record all of the considerations that 18
U.S.C. § 3553(a) lists . . . .").

The district judge did so here. As mentioned above,
his stated reasons for the sentence conformed with the
considerations listed in § 3553(a). The district judge
also explicitly stated that he had taken into account all
the arguments and submissions of Smith's counsel when
fashioning a sentence. Thus, between the district court's
reasoned consideration of the § 3553(a) factors, its atten-
tion to the arguments and concerns presented by
Smith's counsel, and the presumption of reasonableness
we apply on appeal, *see United States v. Whited*, 539 F.3d
693, 699 (7th Cir. 2008), we see no basis under 18 U.S.C.
§ 3553(a) to disturb Smith's sentence.

Lastly, Smith asserts that reversal is warranted based
on the district court's statements during the November 15
sentencing hearing about the possibility of an early
release. Recall that during a discussion of Hundt's qualifi-
cations at the second sentencing hearing, the court men-
tioned its "understanding" was that the Bureau of

Prisons ("BOP") had unfettered discretion to release prisoners early if BOP experts determined that a prisoner was cured. That understanding is incorrect. Since the abolition of parole,[2] the earliest the BOP may release a prisoner is upon serving 85% of his sentence. *See* 18 U.S.C. § 3624(a)–(b). According to Smith, the district court's mistaken comments at the second sentencing hearing affected his sentence.

Smith, however, bears the burden of showing that the district court *relied* on the possibility of Smith's release prior to the 85% threshold when sentencing him. *See United States v. Williams*, 503 U.S. 193, 203 (1992) ("[T]he party challenging the sentence on appeal . . . bears the initial burden of showing that the district court *relied* upon an invalid factor at sentencing . . . ." (emphasis added)). Smith cannot meet that burden. The record provides no support for his claim that the possibility of release prior to serving 85% of his sentence played any role in the district court's determination of his sentence.

The context in which the district judge made the comments about early release is crucial. The district court did not make them during the February 11, 2008 hearing—the fourth and final hearing at which the district court pronounced sentence and gave its reasoning for the sentence it chose. Rather, the district judge's aside about early release occurred at the second sentencing hearing, held on November 15, 2007, three months and two

---

[2] *See* Sentencing Reform Act of 1984, Pub. L. No. 98-473, Title II, 98 Stat. 1987.

hearings prior to the pronouncement of sentence. More-
over, at the time the district judge made those comments,
he was not addressing Smith's sentence. Rather, he had
been explaining his concerns about the basis of Hundt's
expert testimony.[3]

Furthermore, while the fact that Smith could be
released upon serving 85% of his sentence (the correct
understanding of early release under current law) was

---

[3] Our dissenting colleague asserts that the district judge's
"mistaken belief" about early release played a role in his
decision to give Hundt's testimony little weight because the
judge assumed that the BOP would do its own assessment of
Smith's future dangerousness. Dissent at 26-27. It bears repeat-
ing that Smith has *not* challenged on appeal the district court's
finding that Hundt's testimony was entitled to little weight.
Nevertheless, the dissent's assertion about the impact of the
court's mistaken belief finds no support in the record. During
the February 2008 hearing—which, again, was the hearing
where the district judge explicitly gave his reasoning for
Smith's sentence—the district court set forth on the record
several reasons for giving Hundt's testimony little weight. The
court commented on Hundt's lack of qualifications to opine
on Smith's future dangerousness. The court also noted
Hundt's complete reliance on Smith's self-serving statements
from a self-answered questionnaire to support his conclu-
sions. Additionally, the court emphasized the lack of evidence
and testing from experts in the same field supporting Hundt's
theories. None of the reasons given by the district court for
rejecting Hundt's testimony was based on a belief that Hundt's
testimony was unnecessary because BOP experts would
perform a similar analysis.

mentioned several times during the sentencing hearings held thereafter, nothing was said at the later sentencing hearings about the possibility of an earlier release for Smith if the BOP determined that he was cured. Indeed, the only other time the issue of early release was brought up was later in that same November 15, 2007, hearing. Smith's lawyer, not the court, initiated the discussion of early release that second time. And the district court short-circuited the exchange, acknowledging that it did not "have any basis to say they're going to let him out early."

Most importantly, the district judge—immediately after the erroneous aside about early release—expressly discounted the relevancy of the entire discussion to sentencing, stating that it was "neither here nor there." That the district judge thought the discussion irrelevant to sentencing was underscored at the final hearing three months later. At that hearing, the judge pronounced sentence and gave a detailed statement of reasons on the record for the sentence he selected. *Nowhere* did he make any mention of the possibility of early release for Smith, much less a statement seeming to indicate that he relied on that possibility when selecting his sentence.

Smith argues, however, that the court's comments at the final sentencing hearing about its hopes for Smith's psychological treatment and cure indicate its reliance on a misunderstanding of early release. Those comments do little more than express the district court's desire that

Smith get psychological treatment while incarcerated.[4] Yet Smith would have us divine from them an implied reference to an aside about early release uttered at a hearing nearly three months prior—an aside about which the judge expressly said at the time was "neither here nor there." We see no need for such clairvoyance when the record is as clear as it is here. The district court offered many reasons at the February 2008 hearing for sentencing Smith to 240 months' imprisonment. The possibility of an early release was not among them.

The district judge clearly stated his reasons at the last sentencing hearing when he pronounced sentence; no-

---

[4] Smith cites the following statement, made after the district court had listed its reasons for the sentence and stated that it found a sentence of 240 months "fair and reasonable": "Hopefully this sentence will allow the defendant to be treated in an effort to cure his psychological and medical problems in this area, if possible." Smith also points to the district court's statement towards the end of the hearing in response to Smith's request that he be placed at a BOP institution close to Chicago:

> Mr. Foster, you had contacted the Court by way of your motion regarding the placement of the defendant. I do not make a habit of putting a defendant at a specific institution. It's not like picking a hotel. In this case, I have concerns that I would like to see the defendant receive some treatment psychologically, and I think the Bureau of Prisons is probably going to do that anyway. What I am willing to do is to recommend an institution as close to Chicagoland as possible given that they get him to an institution for psychological treatment . . . and then the second object is to get him as close to Chicagoland as possible.

where did he mention the possibility of early release. Yet our dissenting colleague would hold that the district judge's side comments three months and two hearings prior somehow impacted his determination of Smith's sentence. According to the dissent, the comments about the possibility of early release infected the court's decision-making process because the district court never expressly repudiated them on the record. We conclude this was not necessary. We also assume the dissent does not mean to imply that all the district court's sentencing decisions since the passage of the Sentencing Reform Act of 1984 were inappropriate. We find it essential to evaluate the reasons actually given by the district court during the February 2008 hearing for Smith's sentence. As none of those reasons implicated early release, Smith's argument that the district court relied on the possibility of early release in fashioning his sentence must fail.

The dissent also would not credit the district court's dismissive statement about the discussion of early release being "neither here nor there." Dissent at 27. The dissent correctly observes that just because a district court says a decision is correct as a matter of law does not make it so. The district judge's musings during his detour into early release were not correct as a matter of law. But that is not the issue here. We must determine whether the district judge *relied* on the misunderstanding in determining Smith's sentence. *See Williams*, 503 U.S. at 203. We conclude he did not. He discarded his inaccurate observations at the end of his discussion on the reliability of Smith's proposed expert. The digression into early

release was "neither here nor there." Consequently, there is no need to remand this case for resentencing.

## III.

The district court acted well within its discretion when it denied Smith another continuance to allow him to try to find a more acceptable expert after the court found Hundt's qualifications lacking. The court also correctly applied 18 U.S.C. § 3553(a) when sentencing Smith, and its statement of reasons supporting the 240-month sentence was more than adequate under that section. Finally, there is no evidence on the record that the district court's tangential statements about early release during the second sentencing hearing played any role in the court's determination of Smith's sentence at the fourth and final sentencing hearing three months later. We AFFIRM.

ROVNER, *Circuit Judge*, dissenting.  There is no doubt that Larry G. Smith committed a heinous crime when he decided to collect and trade child pornography. There is no doubt that the images contained on his computer were of the most horrific kind. There is no doubt that he is a very disturbed young man. Unfortunately, there is also no doubt that the district judge seriously misstated the law regarding the role of the Bureau of Prisons ("BOP")

in determining release dates for federal prisoners. The majority seems to agree that the district court's "understanding" that the BOP had unfettered discretion to release prisoners early if BOP experts determined that the prisoner was cured is "incorrect." *Supra* at 16. The majority finds that Smith has failed to demonstrate that the district court relied on this misunderstanding of the law in determining his sentence. I find it incomprehensible that such a misunderstanding could *not* influence a judge's sentencing decision.

The original exchange, which came after defense counsel stated he would like to address the defense expert's testimony, is worth repeating in its entirety:

THE COURT:   You can address it. But like I said, I will go through it, but if you are going to address why you think Mr. Hundt is an expert, I want to know why he's an expert, what he said, and how he drew the conclusion because there are a lot of comments that he made from a self-answered questionnaire by the defendant. And from that it appeared, at least—and I'm going back from recollection right now, that one diagnosed the problem which he may be able to do, psychologists do that to some degree, and then talks about his cure and everything else. I didn't hear any expertise on that, whether or not prison is

going to be good for him or bad for him, and whether or not he can be cured in prison.

Now, my experience from dealing with people that I have sent to institutions is that the institutions have experts in all these fields, and they determine whether people are treatable, how long they're treatable, and if they're cured, then they can—**they can release somebody I had given life to at any time. I can't make them hold onto a person. Once he hits the Bureau of Prisons, it's up to the Bureau of Prisons how long they're going to keep them up to the maximum that I give.**

MR. FOSTER:[1] I'm not following you, Judge. You sentence someone to X number of months to the Bureau of Prisons, **with due respect, the Bureau of Prisons can't jockey your sentence around.**

THE COURT: **I'm sorry, Mr. Foster. That's not my understanding. I have had people that I've sent to prison for 30 years, and 8, 9, 10 years they release them be it overcrowding, be it whatever reasons**

---

[1]  Mr. James Foster is Smith's appointed counsel.

**they want. It's under their jurisdiction.**

Now, if I sentence somebody to 10 or 15 years, they can't up it to 30 or 40 years. They don't have that power, I don't think.

MR. FOSTER: I have just never in the years I've practiced, never been fortunate enough to represent a person who was released early from a federal prison short of the 85 percent since we got rid of parole boards. I never saw it happen; never read a case citing that they had the authority to do that, but—

THE COURT: Mr. Foster, this is preguidelines. I think you were involved in a drug case that I had, the Bloom people.

MR. FOSTER: I remember that vaguely.

THE COURT: And several of those people received very, very heavy sentences, and they were released.

Don't get me wrong, it wasn't they weren't [sic] released in months, but they were released far before the time that, you know, I had sentenced them.

MR. FOSTER: And I do think that back there where we used to say a rule of thumb was one-third and where we still had pa-

role boards, I think it was possible. But, boy, I think today they do 85 percent of what you give them minus a very—a lot of circumstance.

THE COURT: I lose track of them, Mr. Foster, after they leave my court, but **my understanding is that the Bureau of Prisons have a lot of say.** But that's neither here nor there.

R. 116, at 37-39 (emphasis added).

Of course, as the majority and the government concede, the BOP does *not* "have a lot of say" in determining the release dates for federal prisoners. Rather, release dates are determined by statute. *See* 18 U.S.C. § 3624. Subsection (a) provides that "[a] prisoner shall be released by the Bureau of Prisons on the date of the expiration of the prisoner's term of imprisonment, less any time credited toward the service of the prisoner's sentence as provided in subsection (b)." Subsection (b) governs credit toward service of a sentence for "satisfactory behavior." Under that provision, a prisoner who has displayed "exemplary compliance with institutional disciplinary regulations" may receive a credit of up to fifty-four days per year toward completion of the sentence. This amounts to a fifteen percent reduction for a prisoner who earns the full credit during each year of the term of imprisonment. Acknowledging the district court's error, the government argues only that it was harmless. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). I do not believe such an error could be harmless.

There are two significant problems with the majority's analysis of this issue. First, a district judge who believes the BOP can release a prisoner at any time, either because the prisoner has been cured or because the prison is overcrowded, mistakenly thinks he is sentencing a defendant to a term of **up to** twenty years rather than a straight twenty years. Any defendant can readily tell the difference between a fixed term of twenty years (minus fifteen percent for good behavior in the federal system) and a term of up to twenty years. Most prisoners would prefer the latter. If the judge did not understand that the defendant would serve at least seventeen of the twenty years, but instead thought that Smith could be released by the BOP as soon as he was cured, then the court did not understand the gravity of the sentence.

Second, because the court believed that BOP experts would determine when Smith could be safely released, it delegated to the BOP the court's own responsibility for determining how dangerous Smith is and whether he could be rehabilitated. This mistaken belief also allowed the court to be dismissive of Smith's proffered expert because the court assumed a BOP expert would "determine whether people are treatable, how long they're treatable, and if they're cured[.]" R. 116, at 38. With that assumption, a court would have no need to seriously consider the qualifications or testimony of the defendant's expert on those issues. Mr. Hundt, Smith's proffered expert, testified that he is a licensed clinical social worker and certified addictions counselor. He received his graduate degree from the University of Chicago, and has received additional training from the federal government in the treat-

ment of sex offenders. He had been treating sex offenders for approximately ten years at the time of his testimony, mostly for the Department of Corrections in Indiana. Mr. Hundt also told the district judge that he often testifies in court, predominantly for the prosecutor's office. These credentials are not easily dismissed, although the district court could, in its discretion, reject them as inadequate. But the court may not reject an expert because it mistakenly believes it can delegate to the BOP's experts the task of assessing Smith's potential for rehabilitation. As I read the sentencing transcript, it appears the district court relied at least in part on that mistaken belief.[2]

The majority states that the district court "expressly discounted the relevancy of the entire discussion of early release to sentencing, stating that it was 'neither here nor there.'" *Supra* at 18. Why we should accept the district court's blithe dismissal of the significance of its own error is mystifying. We have no obligation to defer to a district court making an error of law. *United States v. Wesley*, 422

---

[2] The majority correctly points out that Smith did not appeal the district court's finding that Hundt's testimony was entitled to little weight. I address the effect of the court's misunderstanding on the rejection of the expert to give context, to explain the possible wide-ranging effects of such a misapprehension, and because the government in its brief argues that the colloquy concerning the "side-issues" (specifically, the early release issue) was rendered "completely meaningless" once the court discounted the expert. To the contrary, the court's dismissal of the expert was likely a side-effect of its misunderstanding about the role of the BOP in early release.

F.3d 509, 512 (7th Cir. 2005) (review of an underlying legal ruling is non-deferential).

The majority cites the district court's later statement, "I don't have any basis to say they're going to let him out early," *supra* at 18, as evidence that the court correctly understood the law relating to the BOP's authority. *See* R. 116, at 93. But we must review this statement in the context of the entire colloquy. As quoted above, defense counsel attempted to correct the court's error of law, noting that under current federal law, all defendants serve at least eighty-five percent of their sentences. R. 116, at 38-39. Attempting to repeat this correction of the law later, defense counsel said, "[Y]ou said maybe they'll let him loose early. Judge, I don't believe they will." R. 116, at 93. The court then repeated its earlier error, countering with, "I said they could," meaning the court believed that the BOP had the *legal* authority to release Smith early. R. 116, at 93. When the court followed this error with its statement that it did not "have any basis to say they're going to let him out early," the court clearly meant it had no *factual* basis to believe Smith would be released early; there was, after all, no way for the court to know whether the BOP would be able to treat Smith and declare him cured. R. 116, at 93. There is no evidence in this record that the court ever understood that the BOP has no legal authority to release Smith early.

The majority also states that "the fact that Smith could be released upon serving 85% of his sentence (the correct understanding of early release under current law) was mentioned several times during the sentencing hearings

held thereafter[.]" *Supra*, at 17-18. The only references to the eighty-five percent figure that I could find in the record after the errors cited above were: (1) defense counsel's statement that "[w]e can put him in there for 20 years, and at 85 percent we know they'll turn him loose, and there's a possibility you say of getting loose earlier." R. 116, at 95; (2) government counsel's statement that "[e]ven a maximum sentence of 20 years, which means that he would do 17 years of real time, gets him out when he's 40." R. 117, at 34; and (3) government counsel's oblique reference that "[w]e're asking to impose lifetime supervised release given the fact that he'll be 40 years old when he gets out[.]" R. 117, at 43.

The majority contends that, although there were several additional references to the correct understanding of early release, "nothing was said at the later sentencing hearings about the possibility of an earlier release for Smith if the BOP determined he was cured." *Supra*, at 18. But none of those subsequent statements by counsel provide any evidence that the court understood that its original statement of the law was in error. Balanced against defense counsel's attempts to clear up the issue (government counsel remained strangely silent as defense counsel attempted to correct the court's error), we have an alarmingly confused statement from the court regarding the authority of the BOP to release prisoners early. The absence of any subsequent reference to the error during the final sentencing hearing did not cure the problem. I also see no need for "clairvoyance" (*supra* at 19) when common sense tells us that this is the kind of error that would pervade a judge's decision-making process. More-

over, there is no special reason to require that the judge repeat the error at the final sentencing hearing before we treat it as a real error. An error is harmless if, considering the record as a whole, "the error did not affect the district court's selection of the sentence imposed." *Williams v. United States*, 503 U.S. 193, 203 (1992). An error that changed the court's basic framework for determining the sentence cannot be called harmless.

Finally, citing the Supreme Court's opinion in *Williams,* the majority remarked that "Smith bears the burden of showing that the district court *relied* on the possibility of Smith's early release prior to the 85% threshold when sentencing him." *Supra* at 16 (emphasis in original). The Court's full statement of the standard is instructive:

> We conclude that the party challenging the sentence on appeal, although it bears the initial burden of showing that the district court relied upon an invalid factor at sentencing, does not have the additional burden of proving that the invalid factor was determinative in the sentencing decision. Rather, once the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed. See Fed. Rule Crim. Proc. 52(a).

*Williams*, 503 U.S. at 203.[3] As I noted above, I believe Smith has met his burden of demonstrating that the district court relied on an invalid factor at sentencing. Smith does not bear "the additional burden of proving that the invalid factor was determinative in the sentencing decision." *Williams*, 503 U.S. at 203. In harmless error analysis, it is the *government's* burden to prove that the error was not prejudicial. *United States v. Mansoori*, 480 F.3d 514, 523 (7th Cir. 2007). The government has failed to meet that burden here.

The district court might well decide again to sentence Smith to a term of twenty years, and I do not mean to imply with my dissent that twenty years would not be a reasonable sentence. But even defendants who commit the most abhorrent crimes deserve a sentencing decision that is not influenced by legal errors if we are to maintain the rule of law.[4] In light of the district court's legal error,

---

[3] Although the error in Smith's case was one of law rather than the result of a misapplication of the guidelines, the standard for harmless error is the same.

[4] The majority assumes that I do "not mean to imply that all of the district court's sentencing decisions since the passage of the Sentencing Reform Act of 1984 were inappropriate." I make no comment on cases that are not before us. I certainly hope the district court judge has not held this mistaken belief since the passage of that Act, and that this was a momentary lapse, a blip of memory or speech that affects even distinguished jurists from time to time. If we had remanded the case, the district judge might have clarified that he was referring only

(continued...)

which went uncorrected by the court for the remainder of the sentencing hearing, I believe we should vacate the sentence and remand for a new sentencing. Therefore, I respectfully dissent.

---

[4] (...continued)
to pre-guidelines cases. We have only the transcript on which to rely at this stage, however, and the transcript twice indicates a mistaken belief that is never corrected.

---

4-17-09